**Anson Avery MAYNARD,
Petitioner–Appellant,**

v.

**Gary DIXON, Warden, Central Prison, Raleigh, NC; LACY H. THORNBURG, Attorney General of North Carolina, Respondents–Appellees.**

**No. 90–4000.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1991.

Decided Aug. 19, 1991.

---

James Richard Glover, Glover & Petersen, P.A., Chapel Hill, N.C., argued (Ann B. Petersen, Chapel Hill, N.C., Marshall Dayan, North Carolina Resource Center, Raleigh, N.C., on brief), for petitioner-appellant.

Joan Herre Byers, Sp. Deputy Atty. Gen., N.C. Dept. of Justice, Raleigh, N.C., argued (Lacy H. Thornburg, Atty. Gen., Barry S. McNeill, Sp. Deputy Atty. Gen., on brief), for respondents-appellees.

Before RUSSELL, PHILLIPS and MURNAGHAN, Circuit Judges.

## OPINION

PHILLIPS, Circuit Judge:

This is an appeal of the district court's denial of Anson Avery Maynard's habeas petition challenging on eleven separate grounds his 1981 conviction in North Carolina for first-degree murder. The district court granted the State's summary judgment motion on all grounds after deciding not to hold an evidentiary hearing or permit discovery. Maynard challenges the procedures followed by the district court and assigns error to the court's rejection on the merits of four of his claims. Finding no error, we affirm.

### I

Maynard was convicted in North Carolina state court of killing Stephen Henry. Henry's body was found in the Cape Fear River on June 15, 1981, with cinder blocks tied to his ankles and fatal gun shot wounds to his head. The body also showed some minor head wounds that were inflicted before death, and revealed that after Henry was killed he was stabbed in the stomach (apparently to make the body sink).

Henry was last seen alive in the company of Gary Bullard, an acquaintance of Henry and Maynard, on June 13. Bullard had spent the day with Henry helping him move a relative, and in the evening they left together to get some beer, telling Henry's girlfriend that they would return shortly. Henry never returned because, as the State proved with Bullard's testimony, Bullard was in league with petitioner to kill Henry, and in fact Bullard had lured Henry away so that Maynard could kill him.[1]

---

1. Shortly after his arrest with petitioner for first-degree murder, Bullard agreed to testify for the State in exchange for complete immunity.

The evidence offered by the prosecution at trial, taken in the light most favorable to the State, proved the following: Maynard was determined to kill Henry because Henry was providing evidence to state prosecutors about Maynard's leadership role in a burglary ring.[2] Maynard had come up with various plans to kill Henry, but these efforts failed for one reason or another, until the night of June 13, 1981. On that night, Bullard and Henry, after moving furniture, took a walk to get some beer. As they went through the woods, Maynard leaped out and attacked Henry. Maynard hit Henry in the head a number of times. After taping Henry's hands behind his back, Bullard then left the scene to return to his house to get a car. Maynard then shot and killed Henry. Sometime later, Maynard went to Bullard's house and drove off on a Moped. He returned driving a blue pick-up truck. Maynard then placed Henry's body in the truck and ordered Bullard to get in the truck. Bullard and Maynard then drove to Dunn, North Carolina, and tried to bury Henry in a gravel pit, but that proved difficult. They then stopped at a building to get cinder blocks, and using them as an anchor, they dumped the body in the river. A day or so later a fisherman discovered Henry's body.

Based on this evidence, Maynard was convicted by a Cumberland County jury in December 1981 and sentenced to death. Maynard appealed, and the North Carolina Supreme Court affirmed the conviction and the death sentence. *See State v. Maynard*, 311 N.C. 1, 316 S.E.2d 197 (1984). The Supreme Court denied Maynard's petition for certiorari. 469 U.S. 963, 105 S.Ct. 363, 83 L.Ed.2d 299 (1984). Maynard then moved in Cumberland County Superior Court for appropriate post-conviction relief on the ground that the State had withheld exculpatory evidence. An evidentiary hearing followed in which it was revealed that the Cumberland County sheriff's depart-

ment had a statement from a person unconnected with Bullard or Henry indicating that a man named Lee Hunt bragged in mid-June 1981 of placing a body in the river with cinder blocks. However, the motion for relief was denied by the state superior court in August 1987, and the North Carolina Supreme Court in February 1989 denied Maynard's petition.

Maynard's petition for a writ of habeas corpus in the federal district court made four claims relevant to this appeal. One, he contended that the state trial court erred in excluding jurors who might be against the death penalty because such exclusions were not adequately based on findings of fact. Second, he alleged that the post-conviction court's determination of his claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), concerning the withholding of exculpatory evidence, was not supported by the evidence, that it failed to resolve conflicting evidence, and that it did not include findings of historical facts entitled to a presumption of correctness. Third, he alleged that he was denied his right to confront witnesses because prejudicial evidence was offered in the penalty phase concerning petitioner's criminal history without the right to cross-examine. Fourth, he claimed that the instructions to the jury in the penalty phase imposed a unanimity requirement on the finding of mitigating circumstances in violation of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

The district court granted the State's motion for summary judgment on all counts. This timely appeal followed, and we hereby grant Maynard's motion for a certificate of probable cause.

Maynard challenges the procedures followed by the district court in ruling on the State's summary judgment motion, and assigns error to a number of the court's rulings that Maynard's conviction and sen-

---

**2.** Maynard disputes that claim and Bullard's version of the facts. Maynard contends that Bullard wanted to kill Henry because the victim had wronged Bullard in a drug transaction. Maynard further claims that he had denied repeated requests by Bullard to join in the killing

of Henry. Finally, Maynard claims that he has an alibi which places him at a bar when the murder allegedly took place. This theory was supported by some evidence and was presented to the jury, which obviously rejected it.

tence to death were not infected with constitutional error. We will consider his contentions in turn.

## II

Maynard raises various objections to the procedure followed by the district court in granting the State summary judgment. Principally, he objects to the district court's decision to grant summary judgment without first addressing his request for discovery, an evidentiary hearing, and a briefing schedule, and to the fact that the district court disposed of his objection on the jury *voir dire* before the trial court transcripts were filed.

### A

■ In response to Maynard's habeas petition, the State submitted its answer and a brief supporting its motion for summary judgment. In that document, the State noted that its answer was not complete because all of the relevant state court records, including the transcripts from the jury *voir dire*, were not yet available and that those documents would be provided later to the court.

Without waiting for additional documents, the court granted the state summary judgment, rejecting Maynard's claim that jurors who had doubts about the death penalty were excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), which held that a venireman should only be excused where his views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852. The district court ruled:

> A review of the *voir dire* transcript reveals that although both jurors ... were less than certain about their beliefs concerning the death penalty when initially questioned, they later unequivocally responded that they could not impose, in good conscience, a sentence of death.

J.A. at 260–61. The court then supported its conclusion by discussing in detail the responses of the veniremen made during the *voir dire*. *Id.* at 261–62.

Maynard asserts that the court's decision must be in error because the transcripts were unavailable to the court, as the State had not yet filed them. Hence, he argues, the court's decision must be reversed since the court could not have "review[ed] ... the voir dire transcript."

The district court may have overstated its basis, but its assertion is essentially correct. Though it lacked the full transcript, the court had access to the relevant portions of the transcript, since they were included in Maynard's habeas petition. *See* J.A. at 50–51, 52–55 (containing relevant *voir dire* transcripts). Those excerpts include references to the transcript pages, which is how the district court had cites to the transcript even though it was not filed. Moreover, Maynard's habeas petition, read in light of Fed.R.Civ.P. 11, has been certified as true. *See* J.A. at 96. Consequently, the court could rely on the information included therein. The district court's proceeding without the formally submitted transcript was not therefore in error.

### B

Maynard's second procedural claim is that the district court acted prematurely in ruling on the summary judgment motion without first considering his request for discovery, an evidentiary hearing, and briefing schedule. First the request for an evidentiary hearing and briefing schedule will be considered, and then the motion for discovery.

■ The district court followed the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules") in acting on Maynard's petition. Rule 8(a) provides that a judge shall determine, in his discretion, whether an evidentiary hearing is required. Hab.R. 8(a). If the court finds a hearing is not required, then "the judge shall make such disposition of the petition as justice shall require." *Id.* Included in this broad grant of authority is the power to decide whether the legal and

factual issues raised in a habeas petition and response should be briefed. *See generally* C. Wright, A. Miller & E. Cooper, 17A *Federal Practice and Procedure: Jurisdiction 2d* § 4268.3, at 505–17 (1988). Consequently, the district court acted consistently with the rules in deciding on its own that no evidentiary hearing was required and that briefing was unnecessary. We find no abuse of discretion in its decision.

■ Maynard also asserts that the district court never ruled on his motion for discovery on his *Brady* claim before granting summary judgment. The *Brady* claim stems from the discovery during the post-conviction proceedings of information in the files of the Cumberland County sheriff's department indicating that the police were given information that a Lee Hunt was allegedly involved with a killing and dumping of the body in the Cape Fear River on the same weekend during which Maynard allegedly killed Henry. In his motion for discovery, Maynard sought to inspect the files of the sheriff's department and district attorney's offices relating to the prosecution of Lee Hunt and Bullard.

■ Rule 6(a) of the Habeas Rules leaves to the discretion of the district court the granting of discovery requests. A court should grant discovery in its discretion where there is "good cause" why discovery should be allowed. In this case, the district court held that Maynard failed to make a showing of "good cause." The court based its finding on the ground that Maynard had a post-conviction hearing on his *Brady* claim before the Cumberland County Superior Court, that the hearing was full and fair, and that the state court findings that the *Brady* material was fully explored by Maynard were supported by the record. On this basis the state court findings of facts were accepted by the district court, pursuant to 28 U.S.C. § 2254(d) and *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), and we do not disagree with this conclusion. The State further points out that Maynard made no request to the state postconviction court to review the files pertaining to Lee

Hunt that he now deems critical, and that he had ample opportunity to seek these documents at the state post-conviction proceeding, but chose not to. In sum, we think that Maynard had adequate opportunity to explore the files of the state, and that the district court was not in error for denying Maynard's discovery request.

## C

■ Maynard further complains that the court's action in granting summary judgment denied him "a meaningful opportunity to present his case." In particular, Maynard contends that because he did not file an answer to the State's summary judgment motion that his position was compromised. We reject this contention for we cannot fault the district court for following the rules.

Rule 56, Fed.R.Civ.P., applies to habeas proceedings, and Maynard therefore was obligated under Rule 56(e) to respond to the State's summary judgment motion by "showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). After Maynard failed to respond to the State's summary judgment motion within the allowed time, or for several months thereafter, the district court decided that it could rule on the summary judgment motion consistent with Rule 56 and Hab.R. 8(a), which permit a district court, once the pleadings are filed and it decides an evidentiary hearing is not required, to "make such disposition of the [habeas] petition as justice shall require." Maynard contends that this process was somehow unfair to him because he was not certain what rules the court was following, that he was confused whether the court was following Habeas Rules or Federal Rules of Civil Procedure.

This contention is unconvincing. Maynard knew that the State's motion for summary judgment was before the court. He knew that Rule 8 gives the court discretion to proceed on the petition as it sees fit. Maynard also knew that Rule 56 applies with equal force to habeas petitions, and that as a result a nonmoving party has the duty to respond to a summary judgment motion or risk the finding of no genuine

issue. This duty is all the greater where, as was true in this case, the state court had made findings that were entitled to a presumption of correctness under 28 U.S.C. § 2254(d). Consequently, we conclude that Maynard had ample notice and opportunity to meaningfully present his case by filing an answer to the summary judgment motion but failed to do so. We hold that this procedure gave Maynard sufficient opportunity to respond to the State's motion, and accordingly we find no error in the proceedings of the court below.

### III

■ Maynard contends that he should be resentenced because he was deprived of his sixth amendment right to confront witnesses at the sentencing phase when the State introduced evidence of prior criminal activity. The State sought to introduce the evidence because Maynard claimed to have "no significant history of criminal activity," a mitigating factor under North Carolina law. On cross-examination Maynard did admit that he pled guilty in 1975 to misdemeanor larceny and misdemeanor assault with a deadly weapon, for which he received probationary sentences. However, he denied remembering the name of the victim and denied shooting the victim in the head. Also at the sentencing phase, Maynard put on his family and friends, who testified to the effect that he had no criminal record. As the North Carolina Supreme Court noted, "The thrust of defendant's evidence was that he had never been in trouble with the law, had no criminal record ...; that he had never caused any problem, had never been involved in any illegal activity...." 316 S.E.2d at 208.

Acting within its right to present rebuttal evidence, *see* N.C.G.S. § 15A–2000(a)(3) (Michie 1990); *State v. Silhan*, 302 N.C. 223, 275 S.E.2d 450, 484 (1981), the State attempted to show that Maynard's criminal conduct was more serious than he suggest-

ed.[3] The State first called an assistant clerk who authenticated the files of all prior cases in Cumberland County involving Maynard. The clerk then read from the files, which showed that the larceny and assault charges had been consolidated for sentencing pursuant to a plea bargain. The clerk also read the indictments, which were incorporated into the court documents. The indictment revealed that Maynard originally had been charged with felony assault with a deadly weapon with intent to kill, but had entered a plea to a misdemeanor charge. Maynard's counsel briefly cross-examined the clerk. The State then called an officer from the Cumberland County sheriff's department who investigated the 1975 assault. He testified that in 1975 he saw head wounds on the victim of the assault, thus showing that the assault involved a gun and was more serious than how Maynard described it. The officer further testified that at the sentencing proceeding in 1975 Maynard told the court that he had no more weapons, and that the state court judge ordered the officer to search Maynard's home, which the officer did and discovered a shotgun and two pistols. Maynard's counsel briefly cross-examined the officer.

Maynard contends the state sentencing court erred when it permitted the grand jury indictment to be read to the sentencing jury, and further erred when it admitted the derivative testimony of the investigating officer. Petitioner concedes that the State can present rebuttal evidence, including evidence of unadjudicated offenses, but he complains that the statements from the grand jury indictment concerning these past offenses (and, derivatively, the testimony from the investigating officer)[4] are not permitted under the sixth amendment.

We take note that as a general rule it is not proper to read a bill of indictment to a jury. *See* N.C.G.S. § 15A–1221(b) (Michie

---

3. This testimony would not have been admissible in the State's case-inchief, since his prior convictions were not felonies. *See* N.C.G.S. § 15A–2000(e)(3) (Michie 1990).

4. Admissibility of the officer's testimony is predicated on admissibility of the information contained in the indictment. For that reason, our analysis focuses on the latter and assumes that the officer's testimony turns on admissibility of the indictment.

1990). That rule is aimed at protecting defendants from the distorting impact that a bill of indictment may have on the jury. In this case, however, those concerns are not immediately present since the indictments read to the jury concerned prior offenses. Petitioner focuses on the fact that the indictments were read to the jury—a practice that is generally not endorsed. *See id.* What petitioner misapprehends, however, is that an old indictment (not the immediately relevant one) was being read to the jury. And equally important, the old indictment being read was part of a final judgment and as such is a court record.

In North Carolina, as in most states, a valid, properly authenticated judgment against a defendant is admissible in a criminal trial. *Id.* § 15A–1340.4(e) ("The original or certified copy of the court record ... shall be prima facie evidence of the facts sets out therein."); *cf.* Fed.R.Evid. 803(22) (certain documents, such as court records, containing hearsay are admissible because of "circumstantial guarantees of trustworthiness"). In this case, the "facts set out" in the court record include the original charge and the indictment. Maynard complains that presentation of these "facts" through the testimony of a court clerk amounts to a violation of the confrontation clause. This contention fails, however, because court records do not violate the rule against hearsay and thus do not implicate the confrontation clause.[5] Of course, a state cannot introduce just any court records; any proffers must meet the test of relevance. Here, the original charge and the indictment were pertinent to *both* the crime charged and the crime upon which judgment was entered. To give the jury a full picture of the defendant's character, as was the State's due (within constitutional limits), the State properly could introduce the original charge and the judgment entered so as to enable the sentencing jury to understand and appreciate the charge pleaded to as well as the "criminal activity" involved.

We note that this information was not offered by the State gratuitously, but instead came in as evidence to rebut Maynard's naked claim that he had "no criminal history." The indictment information and the officer's testimony were relevant because they assisted the jury to understand

---

5. The State argues that *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), and *Williams v. Oklahoma*, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959), stand for the proposition that the sixth amendment has not been fully incorporated at the sentencing phase into the rights secured by the fourteenth amendment due process clause; as a result, the State contends, the confrontation clause does not apply and a state can use any hearsay evidence in the sentencing phase to prove or disprove an aggravating or mitigating factor. Maynard counters with much force that these cases predate *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and must be viewed warily as precedent. Instead, he argues that the Supreme Court adopted in *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the view that a defendant's right to confrontation in the guilt phase of a trial carried over to the penalty phase. *See* 451 U.S. at 446, 101 S.Ct. at 1862 ("The Court already has held that many of the protections available to a defendant at a criminal trial also are available at a sentencing hearing ... [citation includes] right to confront witnesses...."). 

Maynard also finds support from the Eleventh Circuit, which extended the sixth amendment right of cross-examination to the sentencing stage "at least where necessary to ensure the reliability of the witnesses' testimony." *Proffitt v. Wainwright*, 685 F.2d 1227, 1255 (11th Cir. 1982) (defendant entitled under sixth amendment to cross-examine at sentencing hearing a state psychiatrist), *modified*, 706 F.2d 311 (11th Cir.1983); *see also Moore v. Zant*, 885 F.2d 1497, 1511–12 (11th Cir.1989) (en banc) (in finding that "reasonably competent counsel reasonably could have anticipated the extension of Sixth Amendment rights, including the right of confrontation, to capital sentencing proceedings[,]" the court noted, "[p]resaging *Proffitt* was a long line of cases in which Sixth Amendment protections were extended in a variety of circumstances and another line which addressed the special safeguards that are constitutionally mandated in capital proceedings."). *But see Bassette v. Thompson*, 915 F.2d 932, 939 (4th Cir.1990) (citing *Williams v. New York*, court suggested that even in capital cases a defendant does not have right under due process clause to confront and cross-examine at the sentencing phase all witness as to his prior criminal record). Because we hold that the confrontation clause is not implicated by the introduction of court records, since they are a recognized exception to the hearsay rule, we need not reach the more fundamental question of whether the sixth amendment right of confrontation applies to all aspects of the sentencing phase.

the true nature of the misdemeanor charges on which Maynard had been convicted. We hold that under these circumstances it was not constitutional error for the sentencing court to permit the court records to be read in their entirety to the jury.

## IV

■ Maynard assigns error to the holding of the district court that the state trial court's excuse for cause of two veniremen arguably opposed to the death penalty was supported by the record and not violative of the sixth, eighth, or fourteenth amendment. We agree that the jury was properly "death qualified" and affirm.

Under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), a venireman can be excused if his views on the death penalty "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright*, 469 U.S. at 424, 105 S.Ct. at 852. The Court has held that the question of juror bias is to be resolved by the trial judge's assessment of demeanor and credibility, and that such assessments are to be accorded a presumption of correctness under 28 U.S.C. § 2254(d). 469 U.S. at 426–29, 105 S.Ct. at 853–54. Moreover, it has been established in this court that where the prospective juror's response, as captured in the transcripts, reflects some ambiguity in the state of mind of the juror, then the determination made by the trial court, based on its eyeing the juror, is presumed to be consistent with the applicable standard. *See Briley v. Bass*, 750 F.2d 1238, 1246–47 (4th Cir.1984) (where venireman's responses were part equivocal and part in opposition to death penalty, federal habeas court reasonably may rely on trial court's discretion to determine which response accurately reflects venireman's state of mind).

A review of the *voir dire* in this case shows that the two excused veniremen stated, albeit after some pushing by counsel, that they would be unwilling to apply

the death penalty if the facts and the law called for it but it went against their conscience. After a long colloquy with the State's prosecutor, in which venireman McMillan expressed the moral conflict he had between the law of the State of North Carolina and his own moral beliefs, the prosecutor asked:

Q. [A]re you telling me that if you find some conflict between the law and moral conscience or moral feelings about this matter, that you would make a decision based upon your own conscience as opposed to the law as [the judge] explains it to you?

A. Yes.

J.A. at 55. Similarly, venireman McKoy stated that he was personally opposed to the death penalty. When pressed by the prosecutor whether he would subjugate his personal views and enforce the law, he responded:

A. I would have to lean on my first belief.

\* \* \* \* \* \*

Q. And therefore, if, under the evidence and the law in the case, ... you felt that the death penalty was authorized and appropriate, however, you personally believed that it should not be imposed in this case or in any case for that matter, and would you then vote your personal conscience and vote against the death penalty?

A. I would, yes.

J.A. at 51.

Maynard argues that these responses did not make it "unmistakably clear" that veniremen McMillan and McKoy would "automatically" vote against the death penalty without regard to the circumstances that might emerge at trial. That high-level test, however, was rejected in *Witherspoon*. *See* 469 U.S. at 422–26, 105 S.Ct. at 851–53. Instead, we are left with the question whether the state trial court's determination, with its presumption of correctness, is supported by the record. Though the responses of the veniremen not repeated here do yield a smidgen of ambiguity, on the whole the responses set forth above accu-

rately report the bottom-line responses of the veniremen. In light of the presumption of regularity in the trial court's determination of ambiguous responses, we hold that the decision to excuse veniremen McMillan and McKoy was supported by the record and consistent with the standard in *Wainwright/Witherspoon.*

## V

Maynard contends that the district erred in dismissing his *Brady* claim without an evidentiary hearing. He further contends that the State wrongfully withheld material information. The *Brady* claim stems from Maynard's allegation that various members of the Langston family told the police in June 1981 that a Lee Hunt had told them, or was overheard telling others, that he shot and killed a man and dumped the body in the river, weighed down by cinder blocks. Maynard argues that the state court did not make sufficient findings of fact on whether the alleged contacts by the Langston family ever took place. He submits that there must be a remand for a hearing on this question. He further contends that at least one of the communications about Hunt was in his file and was not turned over to him, in violation of *Brady.* These contentions will be considered separately.

## A

■ The State maintains that the postconviction state court made proper findings, based on its credibility determination of the Langston family witnesses, that the contacts with the police by the Langston family were never made. In ruling on this issue, the state court held:

> As to the allegations [concerning Lee Hunt], the Court concludes that the defendant has not shown by a preponderance of the evidence that this statement was in fact made and that such statements were communicated to the Cumberland County Sheriff's Department. . . .

J.A. at 407.

We find no constitutional error in the proceedings of the post-conviction state court.[6] Maynard's motion for appropriate relief filed May 1986 made detailed allegations concerning statements about Lee Hunt revealing that on June 10 (three days before the killing of Henry) he said that he *had* killed someone and *had* dumped the body in the river. That would place Hunt's alleged murder before the Henry murder. This assertion was not inadvertent: at the start of the postconviction hearing Maynard requested a missing person report to try to pin down when the victim disappeared, so as to support the June 10 date. However, once the hearing started the Langston family witnesses changed their story and testified that the critical date involving Hunt was June 13, not June 10.

After the hearing started Maynard seemed to change his theory regarding Hunt, or at least refined it somewhat, so that Hunt was *forecasting* what was going to happen. The State contends that because Maynard only came up with this theory after the hearing began, that the state court proceedings should not be called into question. We agree. The state court had before it petitioner's motion for appropriate relief which alleged that members of the Langston family had contacted the police about actions Lee Hunt allegedly took on June 10. The court then heard testimony from the Langston family and the police, and made its credibility determinations. These determinations cannot be rendered defective by the claim put forward by Maynard after the hearing started that the detailed allegations concerning Hunt included in his motion for relief took place on June 13 and not on June 10. Our conclusion is grounded in procedural considerations and in logic.

---

**6.** Maynard complains that this finding is inadequate since it merely restates the State's proposed order. That argument is unpersuasive. Though not preferred, trial courts can adopt proposed findings so long as the court, as the trial court here assertedly did, "meticulously compared the proposed findings of fact ... that were presented to the Court by counsel ... and has further compared them to the transcripts, evidence, law and believable facts herein." J.A. at 417. Petitioner gives us no reason to doubt this assertion.

Procedurally, the State responded to petitioner's detailed motion for appropriate relief with an answer and presented evidence at the post-conviction hearing based on these detailed allegations. The State, and the court, are entitled to adequate notice about the substance of the controversy at the hearing. To enable Maynard to call into question the post-conviction court's determinations based on belated changes in theory not offered until after the hearing started, would be to rob the state court of the ability to come finally to decision.

More fundamentally, though, we find Maynard's claim inconsistent with logic. The post-conviction court heard testimony from the Langston family and from the Cumberland County sheriff's department, and the court found, based on its credibility determinations, that Maynard had not shown by a preponderance of the evidence that the Langston family ever communicated their supposed knowledge of Lee Hunt to the police. We fail to see how this conclusion is altered by Maynard's allegation that the Langston family witnesses were talking about June 13 or June 10. Essentially, it is the same witnesses who would appear before the post-conviction hearing to testify on the June 13 events. But the post-conviction state court already has determined the credibility of these witnesses. Under 28 U.S.C. § 2254, these findings are entitled to a presumption of correctness, and we find nothing in the record to rebut that presumption. Consequently, we find Maynard's claim of error to be without merit.

## B

▮▮▮▮ *Brady v. Maryland* requires a prosecutor to turn over "evidence favorable to an accused upon request" or risk violating the accused's due process rights "where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. The Supreme Court has held that evidence must be material as well as favorable before the failure to turn over will be constitutional error. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The *Bagley* Court set forth the test for materiality:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of a proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682, 105 S.Ct. at 3383. The Court also made clear that the defendant has the burden of demonstrating that the State withheld favorable evidence and that the evidence raises a reasonable probability that defendant would have obtained a different result had he use of the evidence. *See id.*

At the post-conviction hearing Ernest Adams testified that he orally notified the sheriff's department on June 11 that he had heard Hunt was involved in a killing and dumping of a body. He also stated that he visited the sheriff's department on June 15 and met with a detective about a similar conversation he overheard that morning, the day the body was found, that Hunt had to leave town because of the body found in the river. The detective prepared an internal memorandum on this meeting and immediately placed it in Maynard's (not Hunt's) folder.[7] The State concedes this document was in their files but they contend Adams's statement was not turned over in petitioner's *Brady* request because it was not material to his guilt or innocence.

---

7. The statement in the police files, memorializing the detective's conversation with Ernest Adams, reported:

    Between 7 and 8 this morning ... I saw this white guy and this Indian talking. They said, "Did you hear about Lee Wayne leaving town, I heard he went to New York." The Indian said, "No, he's in Florida." ... [Earlier, Lee

    Wayne and someone else] started talking about Lee Wayne leaving town because they found that guy in the river. Then one of the guys said that the guy had cement blocks on his feet, and he wondered how he floated to the surface.

    J.A. at 834.

Applying the materiality test from *Bagley*, we find that the statement of Ernest Adams was not material. At the outset we accept that the statement may have been favorable to petitioner. Though the statement itself would not have been admissible on hearsay grounds, it may have assisted Maynard in discovering other evidence or preparing for trial. But the critical question here is, to what ultimate effect? As we stated in *McDowell v. Dixon*, "not all evidence favorable to the defendant will create a reasonable doubt." 858 F.2d 945, 949 (4th Cir.1988). The statement does not indicate that Maynard did not kill Henry. It merely indicates that two unknown persons thought Lee Hunt had to leave town because of some connection with a body in the river. Though the statement itself is not exculpatory, Maynard contends that it would have led his defense team to the testimony of Andrea Langston, who reportedly told the police about Lee Hunt's statements on June 10 concerning a body and the river. Even if that were true, however, that attenuated possibility fails to throw doubt on the verdict, since Andrea Langston testified that Lee Hunt told her on June 10 that a body was in the river and that because of that he had to leave town. Yet the killing of Henry did not take place until June 13. The testimony of Elijah Young is similar to that of Andrea Langston, both of whom testified that they heard Hunt talk of a body in the river on June 10 or 11.

Ultimately, therefore, the statement of Ernest Adams in the police files, and even the post-conviction testimony of Andrea Langston and Young, does not raise a reasonable probability that the jury's verdict would have been different. That is because Hunt's statements, as interpreted by Maynard, essentially point to Bullock as the perpetrator. Yet this theory was put to the jury and they rejected it. Consequently, giving petitioner the full force of the evidence withheld fails to undermine our confidence in the jury's verdict against him. Accordingly, petitioner's *Brady* claim was properly rejected.

## VI

■ The final issue is whether the jury instructions created an unconstitutional risk, under the holding in *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990), that mitigating circumstances had to be found by a unanimous jury. We reach it by assuming, without deciding, that the State waived its defense of non-retroactivity of the *McKoy* rule that may have been available to it under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). So reaching it, we conclude that a fair reading of the jury instruction shows that the sentencing court did not impose a unanimity requirement on the finding of mitigating circumstances.

In *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court reversed a death sentence because the jury instructions and verdict form created "a substantial probability that reasonable jurors ... well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." 486 U.S. at 384, 108 S.Ct. at 1870. Accordingly, the Court saw the unanimity requirement in the instructions under review as violating the clear teaching of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), that a sentencer cannot be precluded from considering mitigating factors in capital cases. *See* 486 U.S. at 375, 108 S.Ct. at 1865.

The verdict form at issue in *Mills* stated: Based upon the evidence we <u>unanimously</u> find that each of the following mitigating circumstances which is marked "yes" has been proven to exist by A PREPONDERANCE OF THE EVIDENCE and each mitigating circumstance marked "no" has not been proven by A PREPONDERANCE OF THE EVIDENCE.

486 U.S. at 386, 108 S.Ct. at 1871 (underscore supplied). After this statement followed a list of mitigating circumstances with a "yes" and "no" after each one.

The *Mills* Court found that "nothing the judge said dispelled the probable inference

that 'no' is the opposite of 'yes' and that if there was a lack of unanimity as to any one mitigating circumstance then the jury should mark 'no.'" *Id.* at 378, 108 S.Ct. at 1867. That risk led the Court to conclude that it was reasonably likely that one member (or eleven members) of the jury could be prevented by one holdout juror from considering mitigating factors.

In *McKoy v. North Carolina*, the Court again reviewed a jury instruction and verdict form to determine whether it imposed a unanimity requirement on the finding of mitigating circumstances. In that case, the verdict form put to the jury a number of questions. In relevant part, the verdict form, supported by the jury instructions, stated:

> Issue One asked: "Do you *unanimously* find from the evidence, beyond a reasonable doubt, the existence of one or more of the following aggravating circumstances?"

> [If the jury answered "yes," they were instructed to proceed to Issue Two.]

> Issue Two asked: "Do you *unanimously* find from the evidence the existence of one or more of the following mitigating circumstances?"

110 S.Ct. at 1230 (citations omitted). The verdict form then provided the following additional instructions: " 'In the space after each mitigating circumstance, write "Yes," if you *unanimously* find that mitigating circumstance.... Write, "No," if you do not *unanimously* find that mitigating circumstance by a preponderance of the evidence.'" *Id.* (citation omitted).

The *McKoy* Court found this verdict form invalid because it posed the same risk that "[t]he unanimity requirement thus [would] allow[ ] one holdout juror to prevent the others from giving effect to evidence that they believe calls" for a negative answer on the question of the death penalty. *Id.* at 1231.

We review the jury instructions and the verdict form used in this case with the decisions in *Mills* and *McKoy* as our guides.

The verdict form used at petitioner's sentencing phase, as supported by the jury instructions, stated in relevant part:

> Issue One: Do you *unanimously* find from the evidence, beyond a reasonable doubt, that one or more of the following aggravating circumstances existed at the time of the commission of this murder?

> Issue Two: Do you *unanimously* find beyond a reasonable doubt that the aggravating circumstance or circumstances found by you are sufficiently substantial to call for the imposition of the death penalty?

> Issue Three: Do you find one or more mitigating circumstances?

> Issue Four: Do you *unanimously* find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances?

J.A. at 888–90 (emphasis supplied). We think a plain reading of the verdict form and the jury instructions indicates that the jury was not given the impression that its conclusions on mitigating circumstances must be unanimous. For one, the word "unanimously" is conspicuously absent from the verdict form question on mitigating circumstances. Equally important, the court's instructions on mitigating circumstances conspicuously lack any mention that the jury must "agree unanimously." *See* J.A. at 872–74. In contrast, the court's instructions to the jury accompanying Issue One and Issue Two constantly refer to "unanimously find" or "agree unanimously." *See* J.A. at 865–71, 871–72. We find this careful instruction by the sentencing court sufficient to impose a unanimity requirement on aggravating circumstances and the other elements of the death sentence deliberations, but not to impose such a requirement as to the mitigating circumstances. Consequently, we hold that this verdict form with these jury instructions does not run afoul of *Mills/McKoy*.

We find support for this conclusion in the North Carolina Supreme Court's recent opinion in *State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106 (1990). In *McNeil*, the North Carolina Supreme Court, on remand from the United States Supreme Court

based on the holding in *McKoy*, considered jury instructions somewhat similar to the ones at issue here. In both *McNeil* and the instant case a unanimity requirement was included for aggravating circumstances but was omitted from the instruction on mitigating circumstances. *Compare* 395 S.E.2d at 108 *with* J.A. at 865–74. The court in *McNeil* held that the instructions violated *McKoy*, but its opinion turned not on the express and omitted unanimity requirement, which it found non-dispositive of the question, *see* 395 S.E.2d at 109–10, but instead on the additional instructions added by the trial court that all jury decisions had to be unanimous. The *McNeil* court stated:

> Although the trial court never explicitly stated that the jury had to be unanimous concerning mitigating circumstances under Issue Two on the forms used, the trial court stated at least three times that the jury's answers to *all* the issues must be unanimous.
>
> The State argues that the lack of an express unanimity requirement in Issue Two on the forms given the jury stands in plain contrast to the express unanimity requirements of Issues One, Three and Four on those forms, and thus no reasonable juror would have interpreted the forms or the instructions to require unanimity as to mitigating circumstances. We disagree.... In this case in which the jurors were instructed at least three times by the trial court that they must be unanimous in their decisions on *all the issues* they answered, we are forced to conclude that, in their entirety, the jury instructions gave rise to a reasonable likelihood that some of the jurors were prevented from considering constitutionally relevant evidence.

395 S.E.2d at 109–10 (emphasis in original).

By contrast to the flawed instructions in *McNeil*, the jury instructions under review here carefully do not include any such general unanimity charge. Instead, these instructions, which we have to assume were followed, are conspicuously different from the instructions in *Mills* and *McKoy*, and lack the same overarching unanimity requirement imposed in *McNeil*. We are sat-

isfied that the difference is significant enough so that these instructions did not preclude a sentencer from considering mitigating circumstances he or she deemed relevant.

## VII

Having found no reversible error in the district court's judgment, we affirm its dismissal of petitioner's habeas petition.

AFFIRMED.