9 F.3d 1545
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jamie Leigh WILSON, Defendant-Appellant.
 No. 92-5862.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 1, 1993.
Decided Nov. 26, 1993.
 
 Appeal from the United States District Court for the Western District of North Carolina, at Asheville, No. CR-91-113-A; Richard L. Voorhees, Chief District Judge.
 Terry Goodwin Harn, Chapel Hill, NC, for defendant-appellant.
 Vicki S. Marani, U.S. Dept. of Justice, Washington, DC, argued (Jerry W. Miller, U.S. Atty., Asheville, NC, on brief), for plaintiff-appellee.
 W.D.N.C.
 AFFIRMED.
 Before NIEMEYER and HAMILTON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Jamie Leigh Wilson (Jamie) appeals her conviction, following a jury trial, for knowingly making a material false declaration in a proceeding before a court of the United States in violation of 18 U.S.C. § 1623(a). Finding no error, we affirm.
 
 
 2
 * The government's theory at trial was that Jamie made a material false declaration at a suppression hearing for her husband, Houston Lee Wilson (Houston), concerning the whereabouts of Houston on the morning of his arrest. For the purposes of this appeal, it is best to begin by discussing the surrounding circumstances of Houston's prosecution.
 
 
 3
 * In February 1991, North Carolina law enforcement authorities suspected that Jamie's brother, Gary Dean Wolfe (Wolfe), an escaped convict, was staying at Jamie's mobile home (trailer). Shortly after obtaining this information, the law enforcement authorities obtained a warrant for Wolfe's arrest. On March 3, 1991, the law enforcement authorities arrived at the trailer to execute the warrant. Several officers planned to converge upon the trailer as soon as they received a prearranged signal from other officers that a telephone call had been made to the individuals inside the trailer.
 
 
 4
 One of the officers planning to converge on the trailer was Lieutenant Sam Flynn of the North Carolina Department of Corrections. As Lieutenant Flynn positioned himself, a small white Ford Ranger pickup truck (Ford Ranger) came up the driveway and parked behind the trailer. Lieutenant Flynn saw Wolfe exit the Ford Ranger from the passenger side, and he saw Houston--whom he recognized from Houston's bushy hair and prior incarceration in a corrections facility in Marion, North Carolina--exit from the driver's side. Houston and Wolfe then entered the trailer.
 
 
 5
 Thereafter, Lieutenant Flynn received the prearranged signal, and he and the other officers entered the trailer and arrested Houston and Wolfe. The officers immediately conducted a protective sweep. In a shed located near the trailer, the officers discovered a copying machine that fit the description of one reported stolen from a local restaurant. In the Ford Ranger, the officers saw a sawed-off shotgun in plain view on the floorboard. Inside the trailer, the officers saw a second sawed-off shotgun on the bed in the front bedroom. Thereafter, Jamie signed a consent to search form. After Jamie signed the form, the officers retrieved, among other things, the two shotguns and the copier.
 
 
 6
 Upon arriving at jail, Houston was placed in the "drunk tank." The next morning--after receiving his medication, being advised of his Miranda[1] rights, and speaking with an attorney--Houston admitted that the sawed-off shotgun found in the Ford Ranger belonged to him, but claimed that the sawed-off shotgun found in the front bedroom belonged to Wolfe. When Houston made these statements, he told the officers that he was feeling okay. According to the officers, Houston's ability to understand the officers' questions and to respond to them intelligently appeared unimpaired. In fact, he bargained for his release on bail by offering to help the police recover a $15,000 ring. Ten days later, on March 14, 1991, Houston admitted to the police that he had participated in the break-in of a restaurant named Calabash West.
 
 B
 
 7
 In federal court, Houston was charged with, among other things, possession of a firearm by a convicted felon and two counts of possessing unregistered firearms. Houston sought to suppress his post-arrest admission to the police that one of the sawed-off shotguns that he was charged with possessing belonged to him. Houston's primary contention was that his statement was not knowingly, intelligently, or voluntarily made on account of intense alcohol withdrawal.[2]
 
 
 8
 At the suppression hearing, Jamie testified twice on behalf of her husband. The purpose of Jamie's testimony was to support Houston's theory that he was suffering from alcohol withdrawal so as to preclude him from knowingly and voluntarily waiving his Miranda rights. Jamie's testimony was also employed to lay a sufficient factual predicate for Houston's expert witness, Dr. Richard Felix, to assess the impact of alcohol on Houston's mental capacity when he waived his Miranda rights and made his admission about the sawed-off shotgun on March 4.
 
 
 9
 During her first testimony, Jamie described Houston's drug and alcohol use up to and including the night of March 2 and morning of March 3. Jamie testified that prior to March 3, Houston had been drinking all day long for two and one-half months and during that time Houston was unaware of the date or the time and was unable to remember anything or comprehend what was said to him. As to Houston's actions on the days preceding his arrest, Jamie testified that Houston was so drunk that he was unable to walk and would have to crawl.
 
 
 10
 During Jamie's second testimony at the suppression hearing, she testified that she and Houston went to bed between 11:00 p.m. and 11:30 p.m. on March 2. She stated she and Houston were alone in the trailer at the time and that they got up the next morning at about 5:30 a.m. Thereafter, she heard a loud noise and concluded it was Houston sneaking out to find some alcohol he had hidden outside the trailer. Once Houston returned, Jamie stated that Houston continued to consume alcohol and accused her of stealing some of the alcohol hidden outside the trailer. Five minutes later Wolfe arrived with breakfast. They sat down to eat, and in about three minutes the police telephoned and announced that the trailer was surrounded. When the police knocked on the door, Houston opened it and he and Wolfe were arrested.[3]
 
 
 11
 On cross-examination, Jamie did not yield from her previous testimony that Houston was with her inside the trailer when her brother drove up in the Ford Ranger.[4] On redirect, Houston's attorney asked Jamie if it were possible that Houston and Wolfe were outside at some point together before they came back inside. Jamie stated that Houston "may have went out and helped him carry the biscuits," but that she did not know. (J.A. 122).
 
 
 12
 On recross, the following exchange took place:
 
 
 13
 Q. Okay. Mrs. Wilson, you are saying that you're sure that you were arguing with [Houston] when you heard the truck drive up ... [.]"
 
 
 14
 A. Yes, sir.
 
 
 15
 (J.A. 123). Thereafter, Houston's counsel asked Jamie if she was certain or uncertain whether she was still arguing with Houston when the Ford Ranger pulled up. Jamie concluded that she was now uncertain. At no time did Jamie recant or express any uncertainty about her testimony that Houston was already at the trailer when her brother drove up on the morning of March 3.
 
 C
 
 16
 The magistrate judge recommended that Houston's motions to suppress be denied. The magistrate judge found that Jamie's testimony was not credible, but contrived. The magistrate judge also found the testimony of Lieutenant Flynn credible and persuasive. The magistrate judge concluded Houston's admission that he owned the sawed-off shotgun found in the Ford Ranger was not obtained in violation of the Fifth Amendment because Houston's statement was neither coerced by governmental authority nor rendered involuntary by Houston's symptoms of alcohol withdrawal.
 
 
 17
 On appeal from the magistrate judge's recommendation, the district court accepted the magistrate judge's proposed conclusions of law, with certain amendments. In regard to Houston's claim that he was too intoxicated to have validly waived his Miranda rights before making his admission, the district court concluded the testimony of "the officers who observed [Houston's] demeanor and spoke with him during his incarceration and interrogation was sufficiently credible to find that [he] voluntarily, knowingly, and intelligently waived his fifth amendment rights," and the magistrate judge "properly discredited" defense testimony concerning Houston's "drinking episodes preceding the arrest." Supplemental Appendix at 22-23. Consequently, the district court denied Houston's motions to suppress.
 
 D
 
 18
 On September 11, 1991, Jamie was indicted for knowingly making a false declaration in a proceeding before a court of the United States in violation of 18 U.S.C. § 1623(a). Following a jury trial, Jamie was convicted on that count. The district court sentenced her to two years probation and ordered her to serve ten months' home detention. Jamie noted a timely appeal.
 
 II
 
 19
 Jamie initially challenges the sufficiency of the evidence supporting her conviction for knowingly making a material false declaration in a proceeding before a court of the United States in violation of 18 U.S.C. § 1623(a).[5] She contends that her testimony at her husband's suppression hearing was neither material nor knowingly false.[6]
 
 
 20
 Our inquiry in resolving challenges based upon the sufficiency of the evidence is whether, viewing the evidence in a light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). Establishing a violation of 18 U.S.C. § 1623(a) requires proof that: (a) the defendant's testimony was given under oath in any proceeding before or ancillary to any court or grand jury of the United States; (b) the testimony was false in one or more respects charged; (c) the false testimony was knowingly given; and (d) the testimony was material to the proceeding in which it was made. United States v. Friedhaber, 856 F.2d 640, 642 (4th Cir.1988) (en banc ). In determining whether a false statement is material, the question is whether "it has a natural tendency to influence, or is capable of influencing, the decision of the fact finder." United States v. Flowers, 813 F.2d 1320, 1325 (4th Cir.1987); United States v. Jackson, 640 F.2d 614, 616 (8th Cir.1981). The government ordinarily bears a light burden in proving materiality. Flowers, 813 F.2d at 1326.
 
 
 21
 Jamie contends that her testimony at the suppression hearing was not material. This argument has no merit. One of the critical issues at Houston's suppression hearing was whether Houston was suffering from alcohol withdrawal at the time he gave his statement on March 4. One of the most relevant considerations in resolving this issue was the amount of alcohol Houston consumed on the days leading up to and in the hours before his arrest. The difficulty in resolving the voluntariness issue was exacerbated by the fact that Houston was ostensibly under--to some degree--the influence of alcohol.[7]
 
 
 22
 The clearly manifested purpose of Jamie's testimony was to corroborate Houston's testimony that he remained at the trailer from 11:00 p.m. on March 2 until his arrest and enable a defense expert to opine, on the basis of her testimony, that Houston was suffering from alcohol withdrawal on March 4 so as to preclude Houston from voluntarily waiving his Fifth Amendment rights and making a knowing and intelligent statement. Jamie's testimony provided the factual predicate--she claimed that Houston drank constantly in the months prior to March 3 and that in the days preceding March 3 he was reduced to crawling. In addition, Jamie asserted that Houston was home on the morning of March 3 consuming alcohol. By placing Houston at the trailer when Wolfe arrived, Jamie buttressed Houston's testimony that he had been drinking steadily between 11:00 p.m. on March 2 and his arrest the next morning and that he had consumed ten miniature bottles of vodka as well as some beer during that time. Jamie's argument that Houston's presence in the trailer was not material to the voluntariness of his statement to the police ignores the cases recognizing that a false declaration need not be material to any particular issue in the case, but rather may be material to any matter properly before the fact finder, including the issue of credibility. See, e.g. United States v. Sablosky, 810 F.2d 167, 169 (8th Cir.) (holding that defendant's false testimony at his wire fraud trial that a fifty second interruption in a taped conversation with a client was caused by the detachment of the recording device and not erasure was material because it related to the integrity of the evidence and the defendant's credibility as a witness), cert. denied, 484 U.S. 833 (1987); United States v. Scivola, 766 F.2d 37, 44 (1st Cir.1985) (defendant's testimony at his stolen property trial material where, if believed by the jury, it would have the tendency to make the jury disbelieve some of the testimony of government witnesses). In light of this precedent, Jamie's testimony unquestionably had "a natural tendency to influence, or [was] capable of influencing, the decision of the fact finder," Flowers, 813 F.2d at 1325, and was, therefore, material.
 
 III
 
 23
 Jamie also contends that the government violated her due process rights under Brady v. Maryland, 373 U.S. 83 (1963), by failing to produce a transcript of Lieutenant Flynn's testimony at the suppression hearing. The purpose of the Brady rule is not "to displace the adversary system as the primary means by which truth is uncovered, but to insure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to the defense counsel but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." United States v. Bagley, 473 U.S. 667, 675 (1985) (footnotes omitted). Under Brady, the suppression by the government of evidence favorable to the defendant violates due process where the evidence is material either to guilt or innocence. Brady, 373 U.S. at 87. Favorable evidence includes impeachment evidence. Giglio v. United States, 405 U.S. 150, 154 (1972). The defendant also carries the burden of showing that the government withheld the favorable evidence. Bagley, 473 U.S. at 682; Maynard v. Dixon, 943 F.2d 407, 417 (4th Cir.1991), cert. denied, 112 S.Ct. 1211 (1992). Assuming the exculpatory or impeachment evidence is favorable, failure to disclose runs afoul of the Brady rule only if the evidence is material. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 685. "A 'reasonable probability' is a probability sufficient to undermine the confidence in the outcome." Id.
 
 
 24
 We find no merit to Jamie's Brady claim. We begin by noting that Jamie did not object to the government's failure to provide a transcript of Lieutenant Flynn's testimony until her Rule 29 motion at the close of the government's case. If Jamie had a problem with not possessing a copy of the transcript, the appropriate time to raise the issue was before or during the cross-examination of Lieutenant Flynn. In any event, the record in this case reveals that the government exercised an open file discovery and that the transcript of Lieutenant Flynn's testimony was placed in the government's file on the date of its transcription (October 25, 1991), more than two months prior to Jamie's trial. This provided Jamie's counsel more than ample opportunity to examine the transcript of Lieutenant Flynn's testimony and employ it at trial. In addition, a tape of the suppression hearing could have been easily obtained in the clerk's office. The suppression hearing was tape recorded and the tape was readily available. Had Jamie requested a tape of the hearing, she could have obtained a copy of it in about an hour. Under these circumstances, Jamie's Brady claim must fail. See United States v. Wilson, 901 F.2d 378, 381 (4th Cir.1990) ("[W]here exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the Brady doctrine."); Arizona v. Youngblood, 488 U.S. 51 (1988) (unless a defendant can show bad faith on behalf of the government, failure to preserve evidence does not result in a denial of due process); Bagley, 473 U.S. at 682 (no Brady violation absent withholding or suppression of evidence by the government).[8]
 
 IV
 
 25
 For the reasons stated herein, the judgment of the district court is affirmed.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 Miranda v. Arizona, 384 U.S. 436 (1966)
 
 
 [2]
 Houston also contended at the suppression hearing that his statement was obtained in violation of his right to counsel. Houston also sought to suppress the sawed-off shotguns and the stolen copying machine on the theory that these items had been seized either pursuant to a warrant lacking in probable cause or pursuant to invalid consent given by Jamie
 
 
 [3]
 Jamie's testimony at the suppression hearing corroborated that of Houston's. Houston testified that he was at the trailer between 11:00 p.m. on March 2 and the arrival of Wolfe in the Ford Ranger on the morning of March 3, consuming ten miniature bottles of vodka as well as some beer. Houston also testified that he saw Wolfe drive up in the Ford Ranger and he helped him carry an armful of biscuits into the trailer
 
 
 [4]
 The following exchange between the prosecutor and Wilson took place:
 Q. Now, Mrs. Wilson, you realize you're under oath; do you not?
 A. Yes, sir.
 Q. You realize that if you testify falsely under oath that you can be prosecuted for perjury for that; do you understand that?
 A. Yes, sir.
 Q. Do you understand that it's an important aspect of this trial whether or not your husband was in that truck as it came up, and you understand that your testimony relates to that issue?
 A. Yes.
 Q. And if you've given false testimony about that that you can be prosecuted for perjury for that; do you understand that?
 A. Yes, sir.
 Q. And if you have testified falsely about that and you change that testimony now and tell the truth about it, you're [sic] telling the truth about it now would be a defense to any false statement that you made about that issue previously; do you understand that?
 A. Yes, sir.
 Q. But once that you've concluded your testimony, that opportunity for defense to the charge of perjury on that issue is forever lost; do you understand that?
 A. Yes, sir.
 Q. Now with that understanding I want to ask you if there's anything about your testimony about your husband being with you for the five minutes or so prior to the time your brother came up in the truck and brought those biscuits into the trailer there that you want to change?
 A. The only thing that I may change is the fact that I don't really know how long we argued. You know, it may have been two minutes. I can't give you a definite, two or five, I mean, sometimes it seems like forever[.] ...
 Q. Mrs. Wilson, isn't it a fact that in the morning hours of March the 3rd of 1991 that your husband and your brother were gone from the trailer and that they were out breaking into the drink machines around the Western part of the state here?
 A. No, sir....
 Q. Now, going back again to your testimony as to your being with your husband when your brother drove up, you say that's around 6:30 or 6:45 that morning when that happened?
 A. Surety [sic ] on time, I'm not.
 Q. But it was when the biscuits were brought in the house, is that your testimony?
 A. That what?
 Q. When the biscuits, the Hardee's biscuits--
 A. Right.
 Q. --were brought in the house you were with your husband immediately before your brother did that?
 A. Yes.
 Q. And your husband didn't bring those in, he didn't help your brother carry those in?
 A. Not that--I don't remember it, no. He may have, I really can't say.
 Q. But for the minutes leading up to that, when you heard the truck come up and stop, you and your husband had been together arguing; is that correct?
 A. Yes.
 [At this point, the defense interposed on objection, which the court overruled.]
 Q. You admit being with your husband for the two to five minutes immediately prior to that happening?
 A. Yes, sir.
 Q. And there's nothing about that you want to change?
 A. No, sir.
 (J.A. 115-21).
 
 
 [5]
 18 U.S.C. § 1623(a) provides:
 Whoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration ... shall be fined not
 more than $10,000 or imprisoned not more than five years, or both.
 
 
 [6]
 We find no merit to Jamie's contention that her testimony at Houston's suppression hearing was not knowingly false
 
 
 [7]
 As noted earlier, after his arrest, Houston was incarcerated in the "drunk tank."
 
 
 [8]
 Interestingly, after the government acknowledged that it had the transcript of Lieutenant Flynn's testimony during the Rule 29 colloquy, counsel for Jamie did not attempt to examine the transcript, move for a continuance, or reopen the cross-examination of Lieutenant Flynn