John Thomas NOLAND, Jr., Petitioner,

v.

Gary DIXON, Warden, Central Prison, Raleigh, North Carolina, Respondent.

No. C–C–88–217–M.

United States District Court, W.D. North Carolina, Charlotte Division.

Sept. 3, 1993.

James P. Cooney, III, Kennedy Covington Lobdell & Hickman, Charlotte, NC, for petitioner.

Joan H. Byers, Special Deputy Atty., Barry S. McNeill, Atty. Gen. of N.C., Dept. of Justice, Raleigh, NC, for respondent.

### MEMORANDUM OF DECISION AND ORDER

McMILLAN, District Judge.

### SUMMARY

#### A.

**PETITIONER IS ENTITLED TO HABEAS CORPUS RELIEF FOR THE FOLLOWING REASONS:**

CLAIM 1. THE COURT'S INSTRUCTIONS ERRONEOUSLY REQUIRED JURY UNANIMITY IN DETERMINING MITIGATING FACTORS AT THE SENTENCING PHASE;

CLAIM 3. PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE TRIAL;

CLAIM 4. PETITIONER'S RIGHTS TO DUE PROCESS UNDER *WAINWRIGHT v. GREENFIELD* WERE VIOLATED WHEN THE TRIAL JUDGE ALLOWED THE PROSECUTOR TO COMMENT UPON DEFENDANT'S CLAIM OF RIGHT TO REMAIN SILENT UNDER POLICE INTERROGATION.

CLAIM 5. THERE WAS PREJUDICIAL ERROR IN THE JURY INSTRUCTIONS AT THE GUILT PHASE;

CLAIM 7. PETITIONER WAS NOT MENTALLY COMPETENT TO STAND TRIAL OR BE SENTENCED TO DEATH.

#### B.

**IN LIGHT OF THE FOREGOING, THE FOLLOWING CLAIMS ARE NOT REACHED:**

CLAIM 2. INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING HEARING;

CLAIM 6. ARBITRARY AND CAPRICIOUS EXERCISE OF PROSECUTORIAL DISCRETION IN SEEKING THE DEATH PENALTY;

CLAIM 8. IMPOSITION OF THE DEATH PENALTY IN NORTH CAROLINA IS ARBITRARY AND CAPRICIOUS:

  A. *JUDICIAL* ARBITRARINESS IN THE IMPOSITION OF THE DEATH PENALTY;

  B. *JURY* ARBITRARINESS IN THE IMPOSITION OF THE DEATH PENALTY;

CLAIM 9. JURY INSTRUCTIONS AT SENTENCING PHASE.

492

## TABLE OF CONTENTS

                                                              Page No.
MEMORANDUM OF DECISION..........................................492

PRELIMINARY STATEMENT..........................................493

CLAIM 1.  THE COURT'S INSTRUCTIONS ERRONEOUSLY REQUIRED
          JURY UNANIMITY IN DETERMINING MITIGATING FACTORS
          AT THE SENTENCING PHASE.................................493
                  (TEAGUE EXCEPTION)................................495

CLAIM 2.  INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING
          HEARING—**NOT REACHED** IN LIGHT OF RULING IN CLAIM 1....496

CLAIM 3.  PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF
          COUNSEL AT THE TRIAL.....................................496

CLAIM 4.  PETITIONER'S RIGHTS TO DUE PROCESS UNDER WAIN-
          WRIGHT v. GREENFIELD WERE VIOLATED WHEN THE TRIAL
          JUDGE ALLOWED THE PROSECUTOR TO COMMENT UPON
          DEFENDANT'S CLAIM OF RIGHT TO REMAIN SILENT UNDER
          POLICE INTERROGATION.....................................499

CLAIM 5.  THERE WAS PREJUDICIAL ERROR IN THE JURY INSTRUC-
          TIONS AT THE GUILT PHASE.................................501

CLAIM 6.  ARBITRARY AND CAPRICIOUS EXERCISE OF PROSECUTORI-
          AL DISCRETION IN SEEKING THE DEATH PENALTY—**NOT
          REACHED** IN LIGHT OF RULING IN CLAIM 1..................496

CLAIM 7.  PETITIONER WAS NOT MENTALLY COMPETENT TO STAND
          TRIAL OR BE SENTENCED TO DEATH...........................504

CLAIM 8.  IMPOSITION OF THE DEATH PENALTY IN NORTH CAROLINA
          IS ARBITRARY AND CAPRICIOUS—**NOT REACHED** IN LIGHT
          OF RULING IN CLAIM 1.....................................496

CLAIM 9.  JURY INSTRUCTIONS AT SENTENCING PHASE—**NOT
          REACHED** IN LIGHT OF RULING IN CLAIM 1..................496

CONCLUSION.......................................................508

ORDER............................................................509

### MEMORANDUM OF DECISION

The lengthy history of prior proceedings is summarized in this court's 18 page order of December 3, 1992 (Document # 36).

John Thomas Noland, Jr., petitioner, was tried before Judge Robert W. Gaines and a jury at the October 25, 1982 session of Superior Court for Mecklenburg County, North Carolina. Noland was convicted on the first degree murder, first degree burglary and other charges, in connection with the deaths of Cindy Milton and Troy Milton, and was sentenced to death in the first degree murder cases.

Noland appealed to the Supreme Court of North Carolina, where his convictions were affirmed. 312 N.C. 1, 320 S.E.2d 642 (1984).

Noland then filed a petition in this court seeking habeas corpus relief. He states nine claims for relief:

1. First Claim for Relief: Instructions requiring jury *unanimity* in determining *mitigating factors* at the sentencing phase;

2. Second Claim for Relief: Ineffective assistance of counsel at sentencing hearing;

3. Third Claim for Relief: Ineffective assistance of counsel at guilt hearing;

4. Fourth Claim for Relief: Violation of Due Process rights under *Wainwright v. Greenfield*, 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), by comment of counsel, to the jury, upon defendant's claim of right to remain silent under police interrogation.

5. Fifth Claim for Relief: Erroneous jury instructions at the guilt phase;

6. Sixth Claim for Relief: Arbitrary and capricious exercise of prosecutorial discretion in seeking the death penalty;

7. Seventh Claim for Relief: Petitioner was mentally incompetent to stand trial or be sentenced to death;

8. Eighth Claim for Relief: Imposition of the death penalty in North Carolina is arbitrary and capricious:

    A. *Judicial* arbitrariness in the imposition of the death penalty;

    B. *Jury* arbitrariness in the imposition of the death penalty;

9. Ninth Claim for Relief: Jury instructions at sentencing phase.

\*    \*    \*    \*    \*    \*

### PRELIMINARY STATEMENT

This suit is not trial of the public defenders. The public defenders are overloaded; even counsel thoroughly experienced and trained in the trial of felony cases would be unable to provide adequate representation, day after day, to the numerous defendants whose life and liberty depend upon the public defenders' skill, energy, intelligence and limited opportunity for preparation. In fact, the question naturally comes to mind whether the most skilled and able lawyers in American history could provide adequate representation to the numerous defendants today's public defenders have to represent.

This case is in part, however, a trial of the *system*.

The system did not work, this time, to protect the rights of the accused, and he deserves a new trial.

\*    \*    \*    \*    \*    \*

For the sake of continuity, the court repeats, below, portions of Document # 36, this court's December 3, 1992 order, wherein the court decided the petitioner's motion for summary judgment on his first claim for relief and his motion for partial summary judgment on claims two and three:

*Claim 1. The court's instructions erroneously required jury unanimity in determining mitigating factors at the sentencing phase*

It is clear that the petitioner is entitled to summary judgment on his first claim for relief in which he asserted *that the jury instructions during the sentencing phase required a unanimous jury verdict in determining mitigating factors.* The unanimity requirement was struck down in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). (Emphasis added.) The petitioner is entitled to a new sentencing hearing.

In the sentencing phase of petitioner's trial, the state court first instructed the jury that the State had the burden of proving three propositions beyond a reasonable doubt:

First, that one or more aggravating circumstances existed.

    \*    \*    \*    \*    \*    \*

Second, that the aggravating circumstance found by you are sufficient—is sufficiently substantial to call for the imposition of the death penalty.

And third, that the aggravating circumstance found by you outweigh any mitigating circumstance found by you.

If you *unanimously* find *all three of these things,* beyond a reasonable doubt, then it would be your duty to recommend that the defendant be sentenced to death. Tr. at 1710. (Emphasis added.)

The trial court next instructed the jury that its verdict would be in the form of answers to four issues. The jurors were specifically instructed that they had to reach a unanimous decision on *each issue:* "After you have reached *a unanimous decision as to each issue,* and after you have made your recommendation in each of the cases, have your foreman mark the appropriate place." Tr. at 1737. (Emphasis added.)

The third issue submitted to the jury was:

Issue Three: Do you find one or more mitigating circumstances?

The jury was further instructed that if it found mitigating circumstances, it need not indicate which mitigating circumstances were found or not found.

In its verdict, the jury answered Issue Three, "Yes," indicating that it had found at least one mitigating circumstance.

The State contends that *Mills* and *McKoy* don't apply here, because the jury was not told that it had to answer Issue Three, concerning mitigating circumstances, unanimously, since the instruction itself did not include the word "unanimously," as the other three instructions did.

However, when the State argued this issue on direct appeal before the North Carolina Supreme Court in 1984, it argued in its brief that "THE TRIAL COURT DID NOT ERR IN INSTRUCTING THE JURY THAT THEIR ANSWERS TO EACH OF THE ISSUES MUST BE AN UNANIMOUS DECISION." Brief at 19, filed April 3, 1984. The State further argued at that time that Noland's claim was governed by *State v. Kirkley*, 308 N.C. 196, 302 S.E.2d 144 (1984). Therefore, the State argued, "the unanimity requirement does not unconstitutionally limit a jury's ability to consider mitigation evidence since in determining whether or not a mitigating circumstance exists, the instructions complained of in no way better the jury's right to consider all the evidence relevant to that circumstance." Brief at 20. The State never contended, in its argument on direct appeal, that the jury was not required to be unanimous in its determination of the mitigating circumstances.

In addition, the North Carolina Supreme Court has addressed the argument now put forward by the State that because there was no *express* unanimity instruction with respect to mitigating circumstances, *McKoy* was not violated. In *State v. McNeil*, the North Carolina Supreme Court ruled as follows:

> In the final mandate, the trial court instructed the jury that: "Your decision, your answers to *any of the issues* as to your final recommendation *must be unanimous*." ...

· . . . .

Although the trial court never explicitly stated that the jury had to be unanimous concerning mitigating circumstances under Issue Two on the forms used, the trial court stated at least three times that the jury's answers to *all* issues must be unanimous.

The State argues that the lack of an express unanimity requirement in Issue Two on the forms given the jury stands in plain contrast to the express unanimity requirements of Issues One, Three and Four on those forms, and thus no reasonable juror would have interpreted the forms or the instructions to require unanimity as to mitigating circumstances. We disagree. "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the way lawyers might." *Boyde v. California*, 494 U.S. at 370 [380, 110 S.Ct. 1190, 1198] 108 L.Ed.2d [316] at 329 [ (1990) ].... We are forced to conclude that, in their entirety, the jury instructions gave rise to a *reasonable likelihood* that some of the jurors were prevented from considering constitutionally relevant evidence. *See Id.* The instructions thus contain the same type of error held to violate the Eighth Amendment by the Supreme Court of the United States in *McKoy*.

*State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106, 109–110 (1990). (Emphasis added.)

· There is further support for this conclusion in the Fourth Circuit's opinion in *Maynard v. Dixon*, 943 F.2d 407 (4th Cir.1991). The Fourth Circuit found in *Maynard* that the jury instructions, which carefully did not mention a requirement of unanimity in the mitigating factors issue, but directed that the jury had to find unanimously the aggravating factors, did not violate *Mills* or *McKoy*. The *Maynard* court stated, "The court in *McNeil* held that the instructions violated *McKoy*, but *its opinion turned not on the express and omitted unanimity requirement, which it found non-dispositive of the question, see* 395 S.E.2d at 109–10, *but instead on the additional instructions added by the trial court that all jury decisions had to be unani-*

mous." *Maynard* at 420. (Emphasis added.)

As in *McNeil*, the trial court in this case, after giving instructions on the four factors to consider [and decide] in sentencing, instructed the jury

> "*After you have reached a unanimous decision as to each issue;* and, after you have made your recommendation in each of the cases, have your Foreman mark the appropriate place or places on the issues and recommendations forms."

Tr. at 1737. (Emphasis added.)

The court finds that the petitioner is entitled to summary judgment on his first claim for relief.

\* \* \* \* \* \*

The petitioner is entitled to a new sentencing hearing. The U.S. Supreme Court wrote in *Mills*, "the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Mills*, 486 U.S. at 376, 108 S.Ct. at 1867. Under *Mills*, if there is "at least a substantial risk that the jury was misinformed," resentencing must occur. *Id.* at 381, 108 S.Ct. at 1869.

*Mills* declared that "it would certainly be the height of arbitrariness to allow or require the imposition of the death penalty" where a single juror prevented the other eleven from finding a mitigating circumstance, *the absence of which resulted in the death penalty.* 486 U.S. 367, 373, 108 S.Ct. 1860, 1865. (Emphasis added.)

In *Lockett v. Ohio*, the Court observed that the penalty of death is qualitatively different from other penalties, and held that its imposition "calls for a greater degree of reliability when the death sentence is imposed." 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978).

The jury in this case found at least one mitigating factor, since it answered Issue Three, "Yes." However, there is no indication which mitigating factors the jury found, *since it was instructed not to indicate which factor or factors it found.*

From the instructions given in this case, a juror could reasonably believe that the jury had to be unanimous to find a mitigating circumstance. *They were expressly told just that.* This meant that, if eleven jurors believed that a mitigating factor existed, and one juror did not, then that mitigating factor did not exist, and thus could not be weighed against the aggravating factor in Issue Four!

The Supreme Court in *McKoy* stated that this violated the principles of *Lockett:* "The unanimity requirement thus allows one holdout juror to prevent the others from giving effect to evidence that they believe calls for a 'sentence less than death.'" *McKoy v. State of North Carolina*, 494 U.S. 433, 438, 110 S.Ct. 1227, 1231, 108 L.Ed.2d 369 (1990).

### The Teague Exception

On the 7th day of May, 1990 (a year and a half after filing its original answer to Noland's habeas corpus petition), the State filed a motion to amend its answer to Noland's original petition for Habeas Corpus. The amendment, Trial Document # 20, raised, for the first time, against Noland's first claim for relief, the alleged affirmative defense of nonretroactivity.

On November 8, 1991, this court entered an order denying the State's motion to amend. The question whether *Teague v. Lane* precludes the application of the holdings of *Mills* and *McKoy* is thus not reached, and the petitioner is entitled to a new sentencing hearing.

However, even if this question were reached, the petitioner would still be entitled to a new hearing based on the Fourth Circuit's decision in *Williams v. Dixon*, 961 F.2d 448 (4th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

The North Carolina Supreme Court had ruled in 1984 that the jury unanimity instruction was constitutional, and found so again in 1988. *State v. McKoy*, 323 N.C. 1, 44, 372 S.E.2d 12 (1988). However, in 1990, the United States Supreme Court *reversed* the North Carolina Supreme Court's decision in *McKoy*, and ruled that the jury unanimity requirement is *un*constitutional. *McKoy v. North Carolina*, 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

The State asserts that *McKoy* cannot be applied retroactively, because it is a new rule

and does not fall into one of the exceptions stated in *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

In *Williams v. Dixon,* the Fourth Circuit Court of Appeals did not reach the issue whether the holdings in *McKoy* and *Mills* were new rules, because it held that even if they were new rules, they fell within the second exception under *Teague. Williams v. Dixon, supra.* The Court of Appeals determined that

> the rules set out in *Mills* and *McKoy* are "bedrock procedural elements" and are "implicit in ordered liberty." The procedures they struck down have been described as "arbitrary and capricious." Those procedures did not provide for the "fundamental respect for humanity underlying the Eighth Amendment." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991 [49 L.Ed.2d 944] (1976). Given the history of the Eighth Amendment jurisprudence and the constitutional requirement of individualized sentences, we believe that a rule striking down an arbitrary unanimity requirement has the same "primacy and centrality" of *Gideon.* [*Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792 [9 L.Ed.2d 799] (1963).] *Therefore, we hold that the Mills and McKoy rules fall within the second Teague exception and should be applied retroactively.* (Emphasis added.)

*Williams* at 456.

It is clear under *Williams, McKoy* and *Mills,* that the jury instructions given in the sentencing hearing in this case were unconstitutional, and that petitioner Noland is entitled to a new sentencing hearing.

Because of this decision, the court will not address Claims Two (Ineffective Assistance of Counsel at sentencing hearing), Six (Arbitrary and capricious exercise of prosecutorial discretion in seeking the death penalty), Eight (Imposition of the death penalty in North Carolina is arbitrary and capricious), and Nine (*Jury instructions at sentencing* phase).

*Claim 2. Ineffective assistance of counsel at sentencing hearing—Not reached in light of ruling on Claim 1.*

*Claim 3. Petitioner received ineffective assistance of counsel at the trial.*

The petitioner asserts, as his *second* claim for relief, ineffective assistance of counsel at the *sentencing* phase, and, as his *third* claim for relief, ineffective assistance of counsel at the *guilt* phase.

On May 1, 1992, petitioner filed a motion for partial summary judgment on his second and third claims for relief. However, in light of this court's decision on petitioner's first claim for relief, *supra,* which entitles him to a new sentencing hearing, the court will consider the petitioner's motion for partial summary judgment only as it concerns his third claim for relief.

The defendant entered a plea of not guilty by reason of insanity. He was represented at trial by the Public Defender of Mecklenburg County, and by an assistant public defender who had never before tried any *felony* case by herself (she had *assisted* in *one* felony trial), much less a *capital* case.

The petitioner calls attention to the following facts in support of his claim of ineffective assistance of counsel at the guilt phase:

1) At trial, petitioner's counsel relied upon the *State's* psychiatrist, Dr. Billy Royal, to provide expert testimony concerning Petitioner's insanity defense. MAR (MOTION FOR APPROPRIATE RELIEF) Tr. at 170.

2) *Dr. Royal was unable to give an opinion* concerning Petitioner's sanity *at the time of the events in question.* Pet. for Habeas Corpus, App. M; MAR Tr. at 173.

3) Petitioner's counsel did not present a single expert witness who testified that Petitioner was insane *at the time of the events in question.* MAR Tr. at 173, 277.

4) Petitioner's counsel did not request the appointment of a psychiatric expert to assist them in the preparation of Petitioner's insanity defense. MAR Tr. at 174–75.

5) Counsel was unaware during this time that a request for the appointment of a psy-

chiatric expert could be made. MAR Tr. at 175.

6) Counsel never discussed the possibility of requesting the appointment of an independent psychiatric expert. MAR Tr. at 277, 303.

7) Co-counsel, who had been with the Public Defender's office for less than a year, and had participated in only one felony jury trial (not as lead counsel) before this capital case, was given the responsibility of developing Petitioner's insanity defense.

8) By the first day of trial, counsel had not decided who would open and who would close, who would present the insanity defense, who would conduct a sentencing hearing, or who would cross-examine the State's witnesses.

9) By the first day of jury selection, counsel had not obtained any expert opinion evidence that Noland was insane at the time of the events in question, nor, other than speaking with Dr. Royal, had they made any attempt to do so.

10) At the time of closing argument, counsel had not yet decided who would open and who would close or what issues each would argue. MAR Tr. at 184–85.

11) Co-counsel was surprised when lead counsel informed the jury that she would argue the issue of second degree murder. She later testified that her thoughts were: " 'Oh my goodness, I don't know the first thing about second degree murder' and it never occurred to me that this was a case where second degree would be an issue....: I was not prepared for anything like that." MAR Tr. at 186.

Petitioner argues that counsel departed from objective standards of reasonableness for attorneys in the conduct of capital murder trials in the guilt phase of Petitioner's trial in that:

a) Co-counsel failed to possess the experience necessary to prepare an insanity defense in a capital murder trial;

b) Lead counsel was inattentive to the preparation of the insanity defense or the defense of the case;

c) They failed to call available witnesses in support of Petitioner's insanity defense;

d) They failed to consult with Petitioner concerning their decision not to present further available evidence on the issue of insanity;

e) They failed to make reasonable efforts to insure that Petitioner was competent at trial;

f) They failed to raise the issue of Petitioner's competency to stand trial;

g) They failed to prepare the insanity defense, case presentation and arguments in a reasonably effective manner;

h) They failed to request the appointment of a psychiatric expert to evaluate Petitioner and assist them in the defense of the case;

i) They failed to object to the trial court's instructions on the issue of insanity and the jury's deliberations on the issue of first degree murder;

j) They failed to object to the introduction of evidence concerning Petitioner's exercise of his constitutional rights after his arrest, including his right to remain silent.

In his motion for partial summary judgment, petitioner alleges that the state court in post-conviction proceedings erred in refusing to allow James Ferguson to testify as an expert on the objective standards of reasonableness under which attorneys trying capital murder cases operated at the time of the petitioner's trial.

The petitioner asserts that he is entitled to an evidentiary hearing under 28 U.S.C. § 2254(d) and *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). In *Townsend*, the U.S. Supreme Court held that a federal court must grant an evidentiary hearing if one of the following can be shown:

(1) The merits of the factual dispute were not resolved in the state hearing;

(2) The state factual determination is not fairly supported by the record as a whole;

(3) The fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

(4) There is a substantial allegation of newly discovered evidence;

(5) The material facts were not adequately developed at the state-court hearing; or

(6) *For any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.* (Emphasis added.)

*Townsend,* 372 U.S. at 313, 83 S.Ct. at 757.

The standards in paragraphs (1), (2), (3), (5), and (6) were adopted virtually verbatim and codified in 28 U.S.C. § 2254(d). However, *Townsend* and § 2254(d) differ in their applications. Section 2254(d) affords state court fact findings a presumption of correctness *unless* the habeas *petitioner shows, or it otherwise appears to the federal court,* that one of the factors in 2254(d) is present. The petitioner argues that when the fact finding procedure employed by the state court was not adequate or the material facts were not adequately developed at the state court hearing, the federal court must grant the petitioner an evidentiary hearing under *Townsend* and in that hearing determine whether the presumption of correctness under § 2254(d) applies.

Petitioner asserts that material facts were not adequately developed at the state court hearing and the petitioner was effectively deprived of any reasonable opportunity to demonstrate a violation of his Sixth Amendment right to reasonably effective counsel at the guilt phase.

At the hearing on the motion for appropriate relief, counsel for the petitioner attempted to present Mr. James Ferguson as an expert witness who would testify on the objective standards of reasonableness for attorneys trying capital murder cases. The presiding judge declined to find Mr. Ferguson an expert on the objective standards of reasonableness for attorneys in criminal cases, stating that it would be impossible for any lawyer to say how a case should be tried, since different lawyers have different methods, and both may be successful. MAR Tr. 234.

MR. COONEY: Just for the record, Your Honor, so I understand, you are go-ing to exclude Mr. Ferguson's testimony as not relevant?

THE COURT: Yeah, I don't think—if you want to make a tender of proof that he will say there is some standard of practice among lawyers trying death cases, and that is so-and-so, make that offer of proof, but I just think that is irrelevant to the inquiry before me.

MAR Tr. 237. The presiding judge then asked Mr. Ferguson to summarize what his testimony would be, and he did, focusing his answer on the sentencing phase of the trial. MAR Tr. 238–240.

In the offer of proof, Mr. Ferguson testi-fied, for the most part, about the objective standards for proceeding at the sentencing phase. Since the petitioner is entitled to a new sentencing hearing on other grounds (Claim One), the only issue the court is now considering is whether he is entitled to an evidentiary hearing to determine the objective standards of reasonableness for an attorney in a capital case during the guilt phase of the trial.

The State has suggested several alleged reasons why petitioner is not entitled to an evidentiary hearing. First of all, the State contends that the state court's ultimate finding whether counsel's various actions fell below an objective standard of reasonableness is not a factual finding which is binding upon this court on federal habeas review, but is instead a mixed question of law and fact. Therefore, this court must address the reasonableness issue anew regardless of this "mixed" finding by the state court. The State thus contends that this court is not bound by the state court's finding whether counsel's actions were unreasonable under the first prong of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (that counsel's performance fell below an objective standard of reasonableness). The State contends that Petitioner cannot show that the state court failed to develop adequately the material facts necessary for a full and fair adjudication of his allegations of ineffective assistance of counsel.

In addition, the State contends that, since the state court allowed Mr. Ferguson to make a tender of proof, and since Mr. Fergu-

son's summary is in the record, this court does not need a further evidentiary hearing.

However, in its argument before the United States Supreme Court in requesting a denial of certiorari on this claim, the State argued:

There is an adequate procedure already present by statute to handle this type of issue in Federal Courts. The Federal habeas corpus statute does not apply a presumption of correctness to state court findings where, among other things, the fact finding procedure employed by the State was not adequate to afford a full and fair hearing or that material facts were not adequately developed at the state court hearing.

\* \* \* \* \* \*

Noland's claim that the Court's refusal to permit Ferguson to testify undercut the fairness of his hearing can be readily litigated in Federal District Court pursuant to the habeas corpus act.

State's Response at 27–28 (citations omitted).

In addition, in his tender, plaintiff's witness did not address the standards for the guilt phase of the trial.

The court determines that the state court did not provide the petitioner an opportunity to develop the facts adequately for a full and fair hearing when it denied the tender of Mr. James Ferguson's testimony concerning the objective standards of reasonableness for the trial of capital cases during the guilt phase.

\* \* \* \* \* \*

### Summary of Decision Thus Far

The petitioner is entitled to summary judgment on his *first* claim for relief.

Granting Petitioner's motion for summary judgment on his first claim of relief means that the court does not reach claims Two, Six, Eight and Nine.

The petitioner is entitled to partial summary judgment on his *third* claim, and the state court's fact finding is not entitled to a presumption of correctness on this issue.

The court ruled as follows in its December 3, 1992 order:

1) That the petitioner's motion for summary judgment on his first claim for relief is *GRANTED* and petitioner is entitled to a new sentencing hearing;

2) That the petitioner's motion for partial summary judgment on his *second* claim is not reached in light of the court's grant of summary judgment on his first claim;

3) That the petitioner's motion for partial summary judgment on his *third* claim is *GRANTED;*

4) That the state court's fact finding on the petitioner's claim of *ineffective assistance of counsel at the guilt phase* is *not* entitled to a presumption of correctness; and

5) That petitioner's request for a new evidentiary hearing to develop the *objective standards of reasonableness* in trying capital cases at the guilt phase is *GRANTED.*

\* \* \* \* \* \*

In the December 3, 1992 order, the parties were directed to brief Claim Four, Claim Five and Claim Seven.

The court now addresses those claims: Claim *Four* (violation of due process rights under *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986)); Claim *Five* (erroneous jury instructions at the guilt phase); and Claim *Seven* (petitioner was mentally incompetent to stand trial or be sentenced to death). Each of these claims has also been raised in the context of Claim Three (ineffective assistance of counsel).

***Claim 4. Petitioner's rights to due process under Wainwright v. Greenfield were violated when the trial judge allowed the prosecutor to comment upon defendant's claim of right to remain silent under police interrogation.***

■ Claim four asserts violation of due process rights under *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986).

The transcript of the trial at pages 1088 and 1089 shows that Noland was arrested shortly after the shootings; that he was placed in a police car in a driveway; that his Constitutional rights (the *Miranda* warnings)

were read to him; and that he was asked if he understood his rights. He indicated that he did. In response to another question, Noland declined to say whether he understood the warnings and he declined to make a further statement. He also refused to sign a waiver. He also said that he wanted to have a lawyer present.

The testimony shows that Noland was consistent in claiming his Constitutional rights and in remaining silent, which the *Miranda* warnings themselves invited him to do.

However, despite the decisions of the United States Supreme Court which uphold the right of an accused person to remain silent under such circumstances, the *prosecution argued in closing argument that the exercise of petitioner's Constitutional rights was inconsistent with the defense of insanity!* The transcript at page 1555 reveals the following comment by prosecution counsel in closing argument:

> "Don't you think that he had emotional conflict after he committed the murders? Maybe he had the amnesia; maybe he didn't. But, isn't it interesting that he didn't have either at the scene in the driveway or at the Law Enforcement Center. But, when he spoke to the doctor in Raleigh...."

The Supreme Court before *Wainwright v. Greenfield,* held in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) that *comment upon the exercise of Miranda rights by a defendant was reversible error even though the State sought to use that exercise of rights only as impeaching evidence on cross-examination.* The *Doyle* court held that defendant's refusal to answer questions pursuant to his *Miranda* rights could not be used against him as a matter of substance, *nor to impeach testimony he might have given later at trial.*

In other words, the Supreme Court decisions require that *Miranda* be taken seriously and that evasions of the *Miranda* rule by sophisticated devices are not allowed.

The Supreme Court in *Doyle* refused to penalize the accused for claiming his right to remain silent; instead, the Court announced the principle that it is

*"impermissible* to penalize an individual for exercising his Fifth Amendment privilege when he is under police interrogation. *The prosecution may not, therefore, use at trial the fact that he stood mute or claimed this privilege in the face of an accusation."* (Emphasis added.)

384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 1625 n. 37, 16 L.Ed.2d 694 (1976).

The Supreme Court has thus made it clear that *Miranda* is for real, and that if a *defendant remains silent* pursuant to *Miranda* warnings under the assurance, express or implied, that his silence will not be used against him; the prosecution may not thereafter offer evidence of, nor comment upon, his silence on that occasion to impeach an explanation offered by the defendant at the trial.

Ten years after *Doyle,* the Supreme Court revisited the subject in *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986):

> The source of the unfairness [in *Doyle*] was the implicit assurance contained in the *Miranda* warnings "that silence will carry no penalty.".... [W]e have continued to reiterate our view that *Doyle* rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'

474 U.S. at 288–291, 106 S.Ct. at 637–38 (quoting *South Dakota v. Neville,* 459 U.S. 553, 565, 103 S.Ct. 916, 923, 74 L.Ed.2d 748 (1983)).

*Wainwright v. Greenfield* was a unanimous decision. The defendant was charged with a sexual crime and pleaded insanity as a defense. The prosecution offered testimony from the police that *Miranda* warnings were given to the defendant and he claimed his right to remain silent. In closing argument, the prosecution asserted that *the exercise of his rights* under *Miranda*

> "demonstrated a degree of comprehension that was inconsistent with his claim of insanity."

The Supreme Court, nine to zero, reversed the conviction and ruled that the accused's

constitutional rights had been violated and the Court refused to make an exception where an insanity defense had been raised. The Court stated:

> The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity.... The implicit promise, the breach, and the consequent penalty are identical in both situations.

474 U.S. at 292, 106 S.Ct. at 639.

The Supreme Court in *Wainwright* buttressed the above analysis by saying that *Doyle* "requires us also to conclude that it was fundamentally unfair for the Florida prosecutor to breach the officers' promise to respondent by using his post-arrest, post-*Miranda* warnings silence as evidence of his sanity." 474 U.S. at 295, 106 S.Ct. at 641.

I quote from page nine of petitioner's brief in support of motion for summary judgment filed February 1, 1993, as follows:

> It is apparent on objective analysis that this unconstitutionally admitted evidence not only contributed to the verdict, but did so in a substantial way. Noland's defense at trial consisted solely of an insanity defense: family members and psychiatric testimony were offered to support his demented and irrational behavior in the years leading up to the shootings. Indeed, Noland's background was emblematic of mental illness, first having been discharged from the Navy for unfitness at a young age, then having held a succession of jobs in his adult life, quitting each due to depression, and finally *having been hospitalized for his mental illnesses three times in the 18 months preceding the shootings.* The State offered no evidence that contested the existence of these mental illnesses nor of the impact they had on Noland's life. Rather, the State simply sought to portray the insanity defense as a sham, created by Noland and his attorneys. In this attack, Noland's mental state after the shootings in exercising his constitutional

rights was a critical component. In short, the introduction of this evidence was not only crucial to the State's case, but constituted some of the most damning evidence against Noland at trial. The introduction of the facts that Noland was read his rights, understood those rights, exercised those rights, remained silent and requested an attorney allowed the State to argue that Noland was not insane at the time of the shootings as exhibited by his conduct shortly after the shootings. (Emphasis added.)

It is thus clear [that] both the State violated Noland's right to due process under *Doyle* and that this violation was not harmless beyond a reasonable doubt.

I doubt that "procedural default" will be seriously asserted on this appeal in response to the telling evidence which is quoted above. Just to take note of the contention, however, it should be remembered that the State pleaded that *Noland* was procedurally barred because his attorneys did not object to this evidence at trial; that the North Carolina state court did *not* find that a procedural default had occurred, but denied the claim on its merits; and that the federal court was free, therefore, to review the claim on its merits. It should be also noted that the State did not raise the issue of retroactivity as a defense to the *Wainwright* principle until the case had wended its way through three courts, over a period of almost three years. This court expressly so ruled in the order of November 8, 1991 (Document # 35), holding that the State had waived the defense of non-retroactivity concerning *McKoy* issues.

\*  \*  \*  \*  \*  \*

Petitioner's claim of his *Miranda* rights was not a subject of fair comment; and comment on it was an error so gross that can not be corrected except by a new trial.

*Claim 5. There was prejudicial error in the jury instructions at the guilt phase.*

Claim five asserts erroneous jury instructions at the guilt phase.

Petitioner is correct.

The trial judge erroneously and prejudicially placed too heavy a burden of proof upon petitioner, by relieving the State of its obligation to prove *each element* of first-degree murder beyond a reasonable doubt.

The jury was instructed that in order to find Noland guilty of first-degree murder:

"The State must prove to you, beyond a reasonable doubt, that the defendant acted with deliberation; which means that he acted while he was in a cool state of mind."

■ Thereafter, on the question of insanity, the trial judge instructed the jury that:

If you are in doubt as to the insanity of the defendant, *the defendant is presumed to be sane and you would find the defendant guilty.* (Emphasis added.)

Tr. at 1586.

*This instruction unlawfully placed the burden upon the defendant to prove his own lack of mental capacity,* rather than leaving the burden where it belonged—a burden upon the State to prove beyond a reasonable doubt all the elements of the crime, *including the requisite mental capacity of the accused.*

This was an error which, standing alone, requires a new trial.

The trial judge told the jury that if they were in doubt about it, defendant was *"presumed to be sane."* The instruction, verbatim, was as follows:

None of these things is conclusive; but, all are circumstances to be considered by you in reaching your decision. If you are in doubt as to the insanity of the defendant, *the defendant is presumed to be sane and you would find the defendant guilty.* (Emphasis added.)

This was clear error. It eliminated from the jury's job any even-handed consideration of the accused defendant's mental capacity and put the burden upon *him* to prove a *lack* of mental capacity at the time of the crime. The cases cited in the petitioner's brief are compelling.

Petitioner's brief in support of motion for summary judgment, pages 21 through 27, provides a clear statement of facts and law, as follows:

In *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970), the U.S. Supreme Court held specifically that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." To convict Noland of first degree murder, the jury was required to find that the State had proved beyond a reasonable doubt that he unlawfully killed with malice, premeditation and deliberation. *See State v. Propst,* 274 N.C. 62, 161 S.E.2d 560 (1968). Thus, the State was required to prove beyond a reasonable doubt that Noland acted after having weighed and balanced the act of killing, *State v. Thomas,* 118 N.C. 1113, 24 S.E. 431 (1896), and by acting in a 'cool' state in furtherance of a fixed design, *State v. Benson,* 183 N.C. 795, 111 S.E. 869 (1922). In order to satisfy due process, the burden of proof on these elements cannot be shifted to the defendant, *see Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), nor can a presumption be created to relieve the State of its burden, *see Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

Clearly the insanity of the accused, if found by the jury, necessarily negates the premeditation and deliberation necessary to first degree murder. Just as clear is the fact that evidence of insanity, while perhaps insufficient to satisfy a jury of the defense, may be sufficient to negate the critical elements of premeditation and deliberation, thus reducing the crime to second degree murder. That is, while the defendant's evidence may not be sufficient to show that he could not distinguish right from wrong, it may be sufficient to show he was incapable of acting with premeditation and deliberation. Noland's jury, however, was specifically instructed that it could *not* consider evidence of his insanity in determining whether he acted with premeditation and deliberation; rather, that evidence could only be considered *after the jury found that he had acted with premeditation and deliberation! The State was relieved of its burden of proving premeditation and deliberation beyond a reasonable doubt!*

In *Leland v. Oregon,* 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), the U.S. Supreme Court addressed the question whether placing the burden of proof of insanity on a defendant unconstitutionally relieved the State of its burden of proving the elements of premeditation and deliberation in a first degree murder prosecution. There, in upholding Oregon's scheme of placing upon the defendant the burden of proving insanity beyond a reasonable doubt, the Court emphasized that the *defendant's proof of insanity was required to be considered on the issue of premeditation and deliberation,* thus insuring that the State bore the burden of proof on this element.

Although a plea of insanity was made in *Leland,* the prosecution was required to prove beyond a reasonable doubt every element of the crime charged, including, in the case of first degree murder, premeditation, deliberation, malice and intent. The trial court repeatedly emphasized this requirement in its charge to the jury. Moreover, the judge directed the jury as follows:

"I instruct you that the evidence adduced during this trial to prove defendant's insanity shall be considered and weighed by you, with all other evidence, whether or not you find defendant insane, in regard to the ability of the defendant to premeditate, form a purpose, to deliberate, act willfully, and act maliciously."

343 U.S. at 793, 72 S.Ct. at 1005. *Leland's* holding and rationale were adopted by *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), where the Court upheld New York's system of placing the burden of proving extreme emotional disturbance on the defendant. In describing *Leland,* the Court noted that its rationale was premised on the fact that "the jury was required to find each element of the crime beyond a reasonable doubt, based on all of the evidence, including the evidence going to the issue of insanity." 432 U.S. at 204, 97 S.Ct. at 2324.

In *Martin v. Ohio,* 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), the U.S. Supreme Court again affirmed the placement of the burden of proof of an affirmative defense—in this case self-defense—on a defen-dant so long as all evidence could be considered by the jury in determining the issues of premeditation and deliberation. In so ruling, the Court observed:

It would be quite different if the jury had been instructed that self-defense evidence could not be considered in determining whether there was a reasonable doubt about the State's case, i.e., that self-defense evidence must be put aside for all purposes unless it satisfied the preponderance standard. *Such an instruction would relieve the State of its burden and plainly run afoul of Winship's mandate.*

480 U.S. at 233, 107 S.Ct. at 1102 (emphasis supplied). Since the instructions at issue in *Martin,* as with those in *Leland* and *Patterson,* were "adequate to convey to the jury that all of the evidence, including evidence going to self-defense, must be considered in deciding whether there was a reasonable doubt about the sufficiency of the State's proof," the due process protection established by *Winship* was not offended. *Id. See, e.g., U.S. v. Domingues–Mestas,* 929 F.2d 1379, 1382 (9th Cir.1991) (*Martin* emphasized that "[s]o long as the jury was permitted to consider the defendant's evidence of self-defense in determining whether the prosecution had met its burden of proving each element of the crime beyond a reasonable doubt" due process was not violated); *Flores v. State of Minnesota,* 906 F.2d 1300, 1303 (8th Cir.1990) (*Martin* teaches that "so long as the jury is instructed to consider all of the evidence of premeditation and intoxication [the affirmative defense at issue in *Flores*], this situation creates no constitutional violation").

The instructions given in Noland's case, by contrast, *prevented* the jury from evaluating Noland's evidence of Noland's insanity in the context of requiring the State to prove premeditation and deliberation. These instructions clearly relieved the State of its burden of proof *on the issue of specific intent.* In effect, *the jury was instructed to consider the State's evidence in a vacuum, and the jury was specifically barred from considering the substantial evidence presented by the defendant as to his state of mind at the time of the events in question.* By barring the

consideration of this evidence on the issue of premeditation and deliberation, the instructions plainly ran afoul of *Leland*'s holding and *Martin*'s observation. Thus, in this case the State did not bear the burden of proving beyond a reasonable doubt the specific intent necessary to commit first degree murder based upon all of the evidence, as required by *Leland, Winship, Patterson* and *Martin;* rather, the State's evidence was considered without regard to any contrary evidence as to Noland's state of mind, and then Noland was forced to *dis*prove his state of mind through the insanity defense.

This due process violation was further aggravated by the trial judge in Noland's case by the application of *a legal presumption that Noland in fact possessed the requisite specific intent! The jury was specifically instructed that, since "sanity or soundness of mind is the natural and normal condition of people," Tr. at 1585, the jury was to presume Noland sane and to find him guilty if it had a doubt as to his insanity!* When combined with the prohibition against considering any evidence of insanity on the issue of *specific intent,* this instruction had the effect of instructing the jury that it must find Noland sane, and thus possessed of the necessary specific intent, *unless Noland disproved that element!*

In effect, these instructions created a presumption similar to those condemned in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) and *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In *Mullaney,* the Court found as violative of due process and *Winship* an instruction that presumed a defendant acted with "malice aforethought" if it was found that the homicide was intentional and unlawful; the defendant then bore the burden of disproving this element. Similarly, in *Sandstrom,* the jury was instructed that in determining whether the defendant had the requisite specific intent to commit murder, "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," thereby relieving the State of its burden on that element. The teaching of these cases is that *any* presumption, even if it is not conclusive, that has the effect of

shifting the burden of persuasion to the defendant on an element of the crime violates due process. *See Sandstrom,* 442 U.S. at 523, 99 S.Ct. at 2459.

In short, it is clear that the trial court's instructions on insanity, by *barring* the use of evidence of insanity on the issue of specific intent and then applying a *presumption* of sanity and specific intent to Noland's actions, relieved the State of its burden of proving each element of the charged crimes beyond a reasonable doubt. Noland's due process rights were thereby violated, and reversible error occurred. *See, e.g., Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).

It is clear that these instructions were prejudicial. The evidence as to Noland's mental illnesses and instability was plenary. Indeed, the State challenged none of the evidence in this regard, but claimed only that these illnesses were not sufficient to have rendered Noland insane. Given the extensive testimony submitted about Noland's hospitalizations, his involuntary commitment, the multiple diagnoses arrived at by mental health care professionals, and his amnesia caused by his mental illnesses at the time of the shootings, a jury could have easily determined that Noland lacked the requisite specific intent—or more precisely the sufficient mental capacity to have formed the requisite specific intent—necessary to have been convicted of the crimes with which he was charged. Noland's convictions should be vacated.

### Claim 7. Petitioner was not mentally competent to stand trial or be sentenced to death.

█ Claim Seven asserts that petitioner was mentally incompetent to stand trial or be sentenced to death.

Petitioner is correct.

I have given considerable thought to trying to improve on **"III. NOLAND WAS NOT COMPETENT TO BE TRIED,"** pages 27 through 37 of petitioner's brief in support of motion for summary judgment. Since I can't, I incorporate below most of pages 27

through 37 of petitioner's brief into the opinion of the court:

It is axiomatic that due process requires that a criminal defendant "whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). *See Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). In this regard, the test of competency includes a determination as to "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him." *Dusky v. U.S.,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). *See Shull v. South Carolina,* 885 F.2d 866 (4th Cir.1989).

As has been noted, it is undisputed that John Noland suffered from a variety of illnesses as of the time of his trial including a borderline personality disorder, depressive neuroses, chronic depression and an inadequate personality. In addition, a psychiatrist swore, in a post-trial affidavit, that Noland suffers organic brain damage, damage which led to many of these mental illnesses and damage which, in combination with the mental and emotional trauma caused by the breakup of his marriage and the taking of his children, led to insanity. Affidavit of Dr. Horacek at ¶¶ 16–29, 22–25, 30–36 (March 30, 1992).

Evidence at the Motion for Appropriate Relief ("MAR") hearing revealed Noland's instability in the months leading to trial. It is undisputed that, following his return from Dorothea Dix Hospital in June 1982, Noland received no psychiatric treatment; he was, however, administered psychiatric medication. MAR at 124. Noland testified that, during the period between his return in June and his trial in November he simply "wanted to die." MAR at 124. His thoughts and feelings were completely preoccupied with wanting to die; he cared nothing for his trial and was incapable of communicating with his attorneys. MAR at 124–25. His sole preoc-

cupation was to "get it over with. I wanted to die, you know, get it over with." MAR at 122. To this end, he refused to discharge his lead attorney even though he "didn't trust him and ... didn't have any confidence in him" because he was told this would delay his trial: "They told me if I fired [him] that I would be in the Mecklenburg County Jail three to four months or longer, and I couldn't stand it in that place any longer. It was like the walls were closing in." MAR at 121. Thereafter, he stopped taking his prescribed psychiatric medication and began saving the pills to commit suicide after his trial. MAR at 122–24. Noland described his depression during this time as severe and worsening. MAR at 141.

Noland repeatedly communicated to his attorneys his desire to die. Tr. at 141–42. Jean Lawson—the attorney with whom he had the most contact—testified that, as trial approached, Noland became more depressed. MAR at 188. At first, he was simply subdued, quiet and fearful, MAR at 165; later, "he became more profoundly depressed. And toward trial he became more anxious to have it over with. He talked more about dying in relation to his children," at one point asking whether his execution would allow his children to receive social security benefits. MAR at 188. Noland's other attorney also noted Noland's depression and mood swings, testifying that "[h]e would break down and cry a lot and we would talk about that. And this mood would last not perhaps for a day but maybe for a week." Tr. at 255, 262. Indeed, in preparing for the trial lead counsel stated that Noland's children could not be used as witnesses because that was "the one thing ... that would have, we felt, sent him off the deep end." MAR at 267.

Noland's behavior at trial was irrational and bizarre. For the most part, he was extremely subdued and uncommunicative: "Mostly he just sat there and didn't really move until it was time to get up and go out." Tr. at 190. Indeed, co-counsel was extremely concerned about controlling Noland at trial:

Q. Were you worried about controlling Mr. Noland during the trial?

A. Yeah. That was one of the things I was trying to do particularly during the presentation of the State's evidence.... And it just seemed the way he reacted to hearing about things in any detail, when he started hearing about what he had done from witnesses and family members, that we were afraid that he was going to lose control somehow. He would just weep and get so upset ... that we weren't sure what he was going to do in front of the jury.

MAR at 190–91. Noland's mental state had so deteriorated during trial that co-counsel regarded consulting with him as "useless. I fed him lifesavers and gave him water and, you know, he just didn't respond to anything else." MAR at 191. *See* MAR at 227–28. Indeed, his passivity and behavior at trial led his attorneys not even to take the chance of allowing him to testify.

We were very concerned about what he would do. With his mood swings, at one point he had expressed the idea that rather than get a life sentence he would rather get the death penalty, so we were a little afraid of what he would say on the stand.

. . . .

At one point he had asked Jean about social security for his children if he was executed, and had expressed to us that he would rather get the death penalty as opposed to serving life sentences. We were a little afraid of him getting on the stand and saying that he wanted the death penalty.

MAR at 262; 268–69. Lead counsel conceded that "I don't know that I really knew what he would do during the course of the trial. I don't know that I could feel comfortable in my own mind in predicting his behavior." MAR at 305. In fact, one of lead counsel's major concerns was ensuring that "he didn't go off into the deep end." MAR at 305. Indeed, lead counsel further testified that "I don't think that Jean and I ever considered using him after we saw the way he was behaving at trial." MAR at 262.

At two points during the trial, Noland's behavior exploded into irrational outbursts. During the State's closing argument at the penalty phase, the Assistant District Attorney read for the jury the mandate for execution given in North Carolina. When he read the section concerning the use of lethal gas, the transcript records the following exchange:

"which administration of such lethal gas shall be continued until life is extinguished and the said prisoner, John Thomas Noland, Jr. is dead."

"MR. NOLAND: I'm already dead."

Tr. at 1679. Noland's attorneys attempted to quiet him, but Noland responded: "Go to hell." MAR at 268. Prior to this, Noland had lashed out at his ex-wife during a recess, asking her, "Was it worth it, was it worth your father and your sister." MAR at 262.

In the face of this evidence, the hearing court nonetheless found that Noland was competent at the time of trial. Order at pp. 8–11. The premises of the hearing court's order were (1) that prior to trial Noland had never been found to be irrational, or to have exhibited any signs of bizarre thinking or psychosis, Order at pp. 8–9, (2) the hearing court's own psychiatric interpretation of the evidence, Order at pp. 8–9, and (3) its conclusion that in wishing for death, Noland "was well aware that he was being tried for his life." Order at p. 10. These premises, however, are wrong, and illustrate why relief should be granted on this claim.

First, the hearing court's initial premise that Noland, prior to trial, "was always found to be able to think rationally and logically, to be fully oriented, not confused and aware of his own situation, with no evidence of bizarre thinking and psychosis," should not be accepted in light of *the hearing court's refusal to allow the defendant the services of a psychiatrist. See* Order, September 17, 1986. This Court, which *permitted* such psychiatric services by its Order of August 19, 1988, now has before it an affidavit of Dr. H. Joseph Horacek, filed in March, 1992. Dr. Horacek is of the opinion that, with a reasonable degree of medical probability, Noland experienced a disassociative state on the night of the shootings, one caused by the mental and emotional trauma of his family life, his mental illnesses and his organic brain damage.

In Dr. Horacek's opinion, this disassociative state rendered it impossible for Noland to distinguish between right and wrong or to appreciate the nature and consequences of his acts. This evidence of insanity prior to trial obviously was not considered by the hearing court, because the hearing court refused to allow psychiatric assistance to counsel; and it renders clearly erroneous the hearing court's evaluation of Noland's mental status before trial.

Moreover, the existence of a prior period of insanity necessarily undermines the hearing court's psychiatric interpretation of the factual evidence presented at the Motion for Appropriate Relief hearing. The existence of diseases and emotional stresses so severe that they had at one point led to behavior sufficient to render Noland legally insane did not disappear after the shootings. Rather, these conditions remained and, under the stresses of being tried for his life, re-emerged: In light of Noland's prior disassociative state, the hearing court's psychiatric interpretation of the factual evidence presented appears to be, simply, medically wrong. This conclusion is set forth in the additional affidavit of Dr. Horacek. In it, after having reviewed the testimony and psychiatric records submitted to the hearing court, and premised upon his earlier finding of insanity at the time of the killings, Dr. Horacek states:

> [I]t is my opinion, with a reasonable degree of medical probability, that many of the same conditions that triggered [Noland's] disassociative state at the time of the shootings were also present preceding and during his trial. These conditions, combined with his known mental illnesses, organic brain damage, lack of treatment and confinement in the Mecklenburg County jail, rendered Noland incapable of making rational decisions about his life, his defense or in any significant and rational way understanding the trial proceedings or his role in them.

Affidavit at ¶ 15. In short, the hearing court's refusal to permit psychiatric assistance to the defendant necessarily undermines its own psychiatric assessment of his mental condition. That assessment has now been shown, by Dr. Horacek's affidavit, to be wrong.

Finally, the mere fact that Noland, by wishing he was dead, appreciated that he was on trial for his life does not begin to meet the test of competency. Rather, the issue is whether Noland had "a *rational* as well as a factual" understanding of his trial such that he had the "ability to consult with his lawyer with a reasonable degree of *rational understanding.*" *Dusky v. U.S.*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). (Emphasis added). The factual evidence presented at the Motion for Appropriate Relief hearing is overwhelming that Noland was incapable of rational action or judgment during the trial; indeed, his unpredictability and irrational behavior led his attorneys to decide not to allow him to testify and to regard consulting with him as "useless." Moreover, Noland at that time clearly desired death perhaps as a consequence of a rational thought process, but more likely to be a result of his mental illnesses, organic brain damage, depression and conditions of confinement.

Because the additional evidence of insanity presented has a direct impact on the issue of competency and the hearing court's conclusions, summary judgment on this claim may not be appropriate. However, at a minimum, an evidentiary hearing should be granted on this claim, one at which the Petitioner will be permitted to present the psychiatric testimony relating to insanity and how it relates to the factual evidence of his mental state and conduct at trial. Indeed, under *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963) such a hearing is required for several reasons. *Townsend* set forth the following circumstances in which federal district courts must conduct hearings:

> (1) The merits of the factual dispute were not resolved in the state hearing;

> (2) The State's factual determination is not fairly supported by the record as a whole;

> (3) The fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing;

> (4) There is a substantial allegation of newly discovered evidence;

(5) The material facts were not adequately developed at the state court hearing; or

(6) For any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

See *Keeney v. Tamayo–Reyes*, —— U.S. ——, —— n. 5, 112 S.Ct. 1715, 1720 n. 5, 118 L.Ed.2d 318 (1992).

In this case, the state hearing court *denied the Petitioner access to psychiatric assistance* on the issue of insanity, and then proceeded to conduct its *own* psychiatric evaluation *based in large part on the absence of medical evidence that the defendant was insane.* The deprivation of psychiatric assistance in state court then, necessarily led to a fact-finding procedure that was not full, fair and adequate and one in which the material facts could not be fully developed. As the affidavit of Dr. Horacek further demonstrates, the state hearing court's ultimate conclusion that Noland was competent to stand trial, as a matter of medical or psychiatric opinion, is not fairly supported by the whole record. Consequently, an evidentiary hearing is required to consider the evidence which the state hearing court denied the Petitioner the opportunity to develop—that is, the evidence of Petitioner's prior insanity and thus of his competence or lack of it. *See* Leibman, Federal Habeas Corpus Practice and Procedure (Supp.1992) § 20.3 at 148 n. 39 ("In situations in which the district court determines that there was a *bona fide* doubt about the petitioner's competence to stand trial and that the state trial court unconstitutionally failed to hold an adequate hearing on the petitioner's competency ... the district court must determine (based, for example, on the length of time since trial, the availability of witnesses, and the availability of evidence of the petitioner's mental state at the time of trial) whether it reasonably can determine retrospectively the petitioner's mental state at the time of trial. ... If, on the other hand, a retrospective competency hearing is *not* feasible, the court must grant the writ and order the state courts to retry the petitioner or release [her].") *See, e.g., Bouchillon v. Collins*, 907 F.2d 589 (5th Cir.1990) (granting writ based upon inadequate state inquiry into competence); *Smith v. Freeman*, 892 F.2d 331 (3rd Cir.1989) (petitioner entitled to hearing on competency at time of guilt plea in light of psychiatric opinion of incompetence).

These reasons as well support a determination by this Court that the findings of the state hearing court are not entitled to a presumption of correctness under 28 U.S.C. § 2254(d)(2), (3), (6), and (8) as a consequence of the facts:

(2) that the fact finding procedure employed by the state court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the state court hearing;

(6) that the applicant did not receive a full, fair and adequate hearing in the state court proceeding;

(8) or ... the federal court in consideration of [the] record ... concludes that such factual determination is not fairly supported by the record.

Specifically, the state hearing court could not consider and weigh all the material facts because it refused to provide the Petitioner psychiatric assistance. As a consequence of that refusal, the hearing court did not consider the expert opinion and evidence of insanity set forth in Dr. Horacek's affidavit, nor could it consider the impact of such evidence on the issue of Noland's competency. Moreover, Dr. Horacek's affidavit, based in part upon the same materials used by the hearing court, reveals quite clearly that the hearing court's psychiatric interpretation of the evidence was simply wrong. Indeed, given that Noland, at a minimum, is entitled to an evidentiary hearing on this issue under *Townsend*, the factual predicates created by the inadequate procedure and hearing conducted by the state court must necessarily be suspect as well.

### CONCLUSIONS

For the reasons set forth above, John Noland's convictions were obtained in violation of his rights under the laws and Constitution of the United States, and he is entitled to appropriate relief.

The petitioner was obviously the victim of severe emotional and mental disabilities at the time of the tragic events so graphically described in the evidence.

The evidence before the court does not support a finding that, at the time of the killing of the victims, he was sufficiently in control of his own will that he should be punished now as a sane person.

He is entitled to a new trial. He is not, necessarily entitled to his *liberty* pending that trial, because he may fairly be considered by State authorities as dangerous to the public; and the State may well be entitled to keep him incarcerated in order to protect the public unless, by some unlikely chance, he recovers from his mental and emotional disabilities.

Assuming that the State has facilities for the long-term incarceration of persons who are mentally disturbed and believed to be dangerous, the State may, with good reason, confine him pending retrial, in such a facility.

If and when the prosecution satisfies the state courts that the petitioner is in a sufficient mental and emotional state that he understands the meaning and consequences of his acts, and is capable of rational decision about those acts, and is therefore capable of being tried, the petitioner is entitled to a new trial and should be afforded such. Any such trial should be conducted with due regard for the principles which have been outlined above.

\*       \*       \*       \*       \*       \*

### ORDER

**IT IS ORDERED:**

1. That the conviction and sentence are **SET ASIDE;**

2. That the State may continue to keep petitioner confined in a place of confinement suitable for persons dangerously insane, unless it is determined by the state courts, after a fair and early hearing, with the petitioner represented by competent counsel, that petitioner has become competent to be tried. If such a hearing is held by the state courts, it must be conducted promptly and the results reported to this court not later than December 1, 1993;

3. That any retrial of petitioner be conducted with due regard for the principles which I have attempted to outline in the foregoing memorandum of decision;

4. That the petitioner's motion for summary judgment on his *First* claim for relief (instructions requiring jury *unanimity* in determining *mitigating factors* at the *sentencing* phase) is **GRANTED** and if, under paragraph 2 above, he is found to be capable of trial, petitioner shall be afforded a new trial;

5. That the petitioner's motion for partial summary judgment on his *Second* claim (ineffective assistance of counsel at sentencing hearing) is not reached, in light of the court's grant of summary judgment on his first claim;

6. That the petitioner's motion for partial summary judgment on his *Third* claim (ineffective assistance of counsel at guilt hearing) is **GRANTED;**

7. That petitioner's motion for summary judgment on Claim *Four* (violation of Due Process rights under *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), by comment of the prosecutor, to the jury, upon defendant's claim of right to remain silent under police interrogation) is **GRANTED;**

8. That petitioner's motion for summary judgment on Claim *Five* (erroneous jury instructions at the guilt phase) is **GRANTED:**

9. The court has granted petitioner's motion for summary judgment on his first claim for relief, and therefore the court does not reach claim *Six* (arbitrary and capricious exercise of prosecutorial discretion in seeking the death penalty);

10. That petitioner's request for an evidentiary hearing on Claim *Seven* (petitioner was mentally incompetent to stand trial or be sentenced to death) is **GRANTED;**

11. The court has granted petitioner's motion for summary judgment on his first claim for relief, and therefore the court does not reach claim *Eight* (that imposition of the death penalty in North Carolina is arbitrary and capricious: (a) *Judicial* arbitrariness in the imposition of the death penalty and (b)

**510**

*Jury* arbitrariness in the imposition of the death penalty);

12. The court has granted petitioner's motion for summary judgment on his first claim for relief, and therefore the court does not reach claim *Nine* (jury instructions at sentencing phase).